# United States Court of Appeals
## For the First Circuit

---

No. 03-1888

UNITED STATES OF AMERICA,

Appellee,

v.

MARCEL HENDERSON,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

---

Before

Lipez, Circuit Judge
Cyr and Stahl, Senior Judges.

---

Jane Elizabeth Lee for the appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for the United States.

---

September 8, 2006

---

**LIPEZ, <u>Circuit Judge</u>**.  Marcel Henderson was the passenger in a car stopped by Michael Kominsky, a patrol officer for the West Bridgewater, Massachusetts Police.  After demanding Henderson's social security number and date of birth, Kominsky found that a police database listed an old warrant for Henderson's arrest.  Acting on the database, which turned out to be wrong about the warrant, Kominsky searched Henderson and found a gun.  Before trial, Henderson moved to suppress the gun, arguing that it had been the product of an illegal stop and that Kominsky had no basis for investigating the passenger in a stopped car. The district court denied Henderson's motion to suppress the gun and held a trial.  After the government belatedly produced evidence relevant to Henderson's motion to suppress, the district court declared a mistrial and held a second suppression hearing.  After the district court again denied Henderson's motion and held a second trial, a jury convicted Henderson of being a felon in possession of a handgun.

Henderson now appeals his conviction and sentence, focusing on the district court's finding that he was not wearing his seatbelt in the stopped car.  Henderson argues that the district court clearly erred in believing Kominsky's testimony that he was not wearing a seatbelt.  In support of this assertion, Henderson emphasizes that Kominsky's testimony was riddled with proven inaccuracies and contradictions and that the district court

explicitly disbelieved important portions of Kominsky's testimony. We agree with Henderson. After a careful review of this unusual record, we are convinced that this is one of those rare cases in which a district court's credibility determination is clearly erroneous.

Anticipating the possibility of this result, the government offers "officer safety" as an alternative basis for investigating Henderson and affirming the conviction. However, Kominsky admitted that he did not have any particularized reason to suspect Henderson of dangerousness or wrongdoing, nor any specific basis apart from a purported seatbelt violation for prolonging the stop in order to investigate Henderson. On these facts, we reject the government's alternative argument as well. Accordingly, we vacate the conviction.

## I.

We review here some of the background facts and the procedural history of this case, leaving the details for a discussion of Kominsky's credibility.

### A. Background

At about ten P.M. on a May evening in 2001, Henderson and his girlfriend, Patrice Alford, were in Brockton, Massachusetts, attempting to get back to Boston, where they lived, after visiting relatives. The couple -- who had stopped dating by the time of the trial -- were in a blue Nissan sedan. Henderson was sitting in the

front passenger seat. Alford, who was driving, was lost. Looking for the expressway, Alford proceeded down Plain Street in Brockton.

As it turned out, Alford was going in the wrong direction. Rather than towards the expressway to Boston, which is just west of downtown Brockton, Plain Street goes southeast from downtown Brockton to the town of East Bridgewater, where it becomes Pleasant Street. Alford observed a police car pull behind her and, because she was being followed, she drove especially carefully. Between Brockton and East Bridgewater, Plain Street cuts through the extreme northeast corner of the town of West Bridgewater. A car driving from Brockton to East Bridgewater on Plain Street travels through West Bridgewater for approximately three tenths of a mile (about 500 yards). At the 35 mile-per-hour speed limit, the transit takes about 30 seconds. Plain Street cuts a straight line through West Bridgewater, without substantial curves.

Kominsky, assigned to patrol that corner of West Bridgewater, stopped Alford's car. He later gave three reasons for the stop, saying that the car was driving slowly, had crossed over the center line of the short stretch of Plain Street in West Bridgewater between two and five times, and was registered to a woman, Alford, who had a suspended driver's license. During the stop, Kominsky asked for Henderson's license and then, when Henderson said he did not have a license, demanded Henderson's name, date of birth, and social security number. Kominsky later

-4-

testified that he wanted Handerson's identification in order to cite Henderson for not wearing a seatbelt. By entering Henderson's information into a database he could access from his laptop computer, Kominsky discovered that there was a five-year-old warrant for Henderson's arrest. Kominsky acted on the information in the database to arrest Henderson. As he was searching Henderson pursuant to the arrest, Kominsky found some ammunition. Henderson then told Kominsky that he was carrying a handgun as well. That gun was the basis for this prosecution.

A second police officer, Carlos Oliveira of the East Bridgewater Police, arrived on the scene in time to see and hear the end of Kominsky's initial encounter with Alford and Henderson. However, Alford and Kominsky both testified that Oliveira did not approach the car until Henderson was arrested.

As it turned out, the warrant Kominsky relied on in arresting Henderson had long since been revoked. However, Henderson accepts for the purpose of this appeal that Kominsky could rely in "good faith" on the computer system. Henderson's theory throughout this case has been that Kominsky never should have obtained from him the personal identification information that led to the computer error and then to his arrest.

## B. Procedural History

In October 2002, the district court held a two-day evidentiary hearing on Henderson's motion to suppress. Henderson

contested both the legality of the vehicle stop and the legality of Kominsky's demand for his identifying information. Kominsky, Alford, and an investigator for Henderson testified for the defense. Concerned about the discrepancy between Kominsky's testimony that Alford's car did not have automatic seatbelts and Alford's testimony that it did, the district court took a view of Alford's car and determined that it did indeed have automatic seatbelts. Nonetheless, the district court denied Henderson's motion in a published opinion. United States v. Henderson, 229 F. Supp. 2d 35 (D. Mass. 2002) (Henderson I).

The case then proceeded to trial. Kominsky was the first witness. After his direct examination, the government belatedly produced documents indicating that Kominsky had been the subject of complaints for subjecting drivers to baseless and harassing stops, along the same stretch of road where he stopped Alford and Henderson. Henderson asked that the trial be stayed and the motion to suppress reopened. The district court conducted a voir dire of Kominsky and then allowed the trial to continue while it considered Henderson's motion.

During a break in Alford's testimony, an Assistant United States Attorney told defense counsel, while Alford was sitting nearby, that Alford was "going to jail for perjury." Alford heard the remark and, according to the defense, became nervous about returning to the stand. The district court examined Alford and

-6-

determined that there was no impediment to her continued testimony. The next day, however, citing the government's delayed disclosure and the other "appellate issues" that had arisen, the district court declared a mistrial and announced that it would consider whether to dismiss the case with prejudice, in light of prosecutorial misconduct.

Ultimately, the district court decided not to dismiss the indictment. It did, however, reopen the suppression hearing. At the reopened hearing, the district court heard testimony from Kominsky, Oliveira, other officers who worked with Kominsky, and a young man, Christopher Bellas, who previously had complained of improper vehicle stops by Kominsky. The district court credited Bellas's testimony that Kominsky had twice stopped his car without cause and had acted improperly during the stops. (Kominsky had denied any such misconduct.) Nonetheless, the district court again denied Henderson's motion to suppress in another published order. United States v. Henderson, 265 F. Supp. 2d 115 (D. Mass. 2002) (Henderson II). The district court acknowledged that its decision to credit Bellas's testimony over Kominsky's "lends weight to the contention that Kominsky's testimony relating to Henderson should not be believed." Id. at 116. The district court then stated: "Other credible evidence, however, tends to support Kominsky's testimony" that Henderson was not wearing his seatbelt during the vehicle stop. Id.

The district court briefly reopened the suppression hearing a third time shortly before the second trial, when the government produced two recent complaints about vehicle stops by Kominsky and a statement by Oliveira that contradicted Kominsky's previous testimony about the language he used while arresting Henderson. The district court declined to reconsider its ruling on the motion to suppress, reasoning that the additional evidence was "cumulative" and that "I don't need to hear any more to have a low regard for Officer Kominsky as a law enforcement officer."

Henderson was convicted at a second trial. At sentencing, the district court stated:

> I two times found by a preponderance of the credible evidence that Mr. Henderson was not wearing a seat belt. That much of Officer Kominsky I credited. But, in candor, I'm not close to sure about that.[1]

## II.

The government argues that Kominsky could demand that

---

[1] Henderson's conviction carried a statutory mandatory minimum sentence of fifteen years. Given his criminal history level of VI, the guideline sentence range was 235-264 months. The district court found at sentencing that Henderson's criminal history level substantially overstated "the likelihood that he'll commit further crimes," and that in Henderson "I also saw a kind of intelligence and maturity that caused me to think that a slightly lower sentence . . . is the most appropriate sentence." The district court imposed a sentence of sixteen years, or 192 months, based on a downward departure of two criminal history levels. The court added: "I've been listening for months and months and months and wondering whether I would find in the presentence report that you were dealing drugs or that you were involved in some gang. And I don't have any evidence of that."

Henderson write down his identifying information because Henderson was not wearing his seatbelt. It is a civil infraction in Massachusetts, carrying as its maximum consequence a fine of $25, for an adult passenger not to wear a seatbelt while "riding" in a car. See Mass. Gen. Laws ch. 90, § 13A. Henderson responds that the court clearly erred when it accepted Kominsky's testimony that Henderson was not wearing his seatbelt during the stop.

## A. Two unaddressed legal issues

Before addressing these arguments, we note, without resolving, two legal issues alluded to in the district court but never pursued or resolved. We identify these issues only to avoid any suggestion that we are resolving them by implication.

First, Kominsky did not believe that he had the power to demand a passenger's identification in order to write a citation for a seatbelt violation. In fact, no witness testified that it would be reasonable for a police officer to demand a passenger's identification in order to write a citation for a seatbelt violation. To the contrary, Kominsky testified that "there's no legal way for me to force [a passenger who is not wearing his seatbelt] to give me the information . . . he's entitled to get a citation [] but if he doesn't give me his information I know of no other way [to issue a ticket] other than citing the driver for the violation."[2] Kominsky had testified that he asked Henderson to

---

[2] The Massachusetts seatbelt law makes a driver liable for

-9-

write down his identifying information and that Henderson voluntarily complied. But the district court never credited this account of voluntary compliance, finding after the first suppression hearing that "Henderson asked Kominsky why he had to provide that information. Kominsky did not answer the question, but insisted that Henderson give him the requested information." Henderson I, 229 F. Supp. 2d at 37 (emphasis added). Kominsky's supervisor, Lieutenant Ray Rogers, also testified that a passenger could be asked but could not be required to produce identifying information unless there was suspicion that he had committed or was committing a crime. In Massachusetts, a seatbelt violation is not a crime. We have found no Massachusetts case that permits a police officer to demand a passenger's social security number and date of birth in order to write a citation for a seatbelt violation.

The second legal issue relates to the absence of any evidence that Henderson failed to wear a seatbelt while the car was moving. Kominsky did not say that he observed any such infraction. Rather, he said that he did not see inside the car until after it stopped. The district court did not say that it had inferred that Henderson was wearing his seatbelt while the car was moving. It is uncontested that some time passed between the stop and Kominsky's

---

permitting a passenger to ride without a seatbelt. See Mass. Gen. Laws ch. 90 § 13A (2006), "[a]ny person sixteen years of age or over who rides as a passenger in a motor vehicle without wearing a safety belt in violation of this section, shall be subject to a fine of twenty-five dollars."

-10-

approach to the car because Kominsky first made a radio call. The one relevant Massachusetts case that we found concluded that a passenger in a vehicle is <u>not</u> obligated to wear a seatbelt after the vehicle has been stopped by a police officer and cannot be cited on the basis of not wearing a seatbelt during a vehicle stop. See <u>Commonwealth</u> v. <u>Nuñez</u>, 15 Mass. L. Rptr. 536, 2002 WL 31973248 at *3 (Mass. Super. 2002).

However, we need not decide the legal question of whether Kominsky could demand Henderson's social security number and date of birth for the purpose of a passenger seatbelt violation citation. Similarly, we need not decide whether Henderson could even be cited for failing to wear his seatbelt on the facts presented. The premise for both of these legal issues would be a finding that Kominsky credibly testified that Henderson was not wearing his seatbelt during the stop. As we now explain, we cannot accept that premise.

## B. Standard of review

We recognize that "a district court's choice between two plausible competing interpretations of the facts cannot be clearly erroneous." <u>United States</u> v. <u>Weidul</u>, 325 F.3d 50, 53 (1st Cir. 2003). Moreover, our inability to see witnesses face-to-face or to appraise in person their "demeanor and inflection," <u>Anderson</u> v. <u>City of Bessemer</u>, 470 U.S. 564, 575 (1985), makes us "especially deferential" to the district court's credibility judgments, <u>United</u>

-11-

States v. Ivery, 427 F.3d 69, 72 (1st Cir. 2005).  Still, as the Supreme Court stated in its seminal case on clear error review:

> [F]actors other than demeanor and inflection go into the decision whether or not to believe a witness.  Documents or objective evidence may contradict the witness' story; or the story may be so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it.  Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination.

Anderson, 470 U.S. at 575.  See also United States v. Forbes, 181 F.3d 1, 7-8 (1st Cir. 1999) (vacating after clear error review factual findings based on a police officer's testimony as to a vehicle stop, where the officer's testimony was "improbable" and "call[ed] into question" by "extrinsic evidence," and the district court "did not explain why it found [the police officer] to be credible").  The basic standard is familiar: we will overturn a district court's factual findings after a suppression hearing "only if, after reviewing all of the evidence, we have a 'definite and firm conviction that a mistake has been committed.'"  Ivery, 427 F.3d at 72, quoting Anderson, 470 U.S. at 573.  Such instances are rare, especially when the factual findings at issue are made by such a careful and able judge.  But this is such an instance.

## C.  Kominsky's testimony

To explain the clear error in the district court's finding about the seatbelt, we discuss Kominsky's testimony topic

by topic, focusing on its documented inaccuracies, internal inconsistencies, and implausibilities. We also note the district court's rejection of Kominsky's credibility on important issues, and the district court's stated impressions of Kominsky's character, demeanor, and professionalism.

### 1. Testimony empirically disproved

On several points, Kominsky gave testimony that was later shown to be simply wrong.

### a. The automatic seatbelts

Alford's car had automatic seatbelts, a point obviously pertinent to Henderson's appeal. Alford testified that the car had automatic seatbelts. The district court confirmed, after taking a view of the car, that "[t]he automobile in which Mr. Henderson was riding on the evening in question does, as Ms. Alford testified, have an automatic seat belt for the front seat passenger." Kominsky, however, testified repeatedly and with certainty that the car had non-automatic seatbelts.

Not surprisingly, the district court probed this seatbelt issue carefully. At the first suppression hearing, the court questioned Kominsky about the seatbelt itself.[3] The district court

---

[3]We quote the colloquy between the court and Kominsky:

THE COURT: Did you observe whether . . . the car had seat belts?

KOMINSKY: Yes, your Honor, the car had seat belts.

-13-

took a view of Alford's car the next day.  These were its findings:

> The automobile in which Mr. Henderson was riding on the evening in question does, as Ms. Alford testified, have an automatic seat belt for the front seat passenger.  It's a belt that attaches to the frame and, when connected, pushes away from the seat toward the windshield when the door, passenger side door, is open.  If a passenger got in and sat down and closed the door, the seatbelt would automatically come back and go diagonally across his chest from his right shoulder to his left waist.  There is also a lap belt that needs to be connected manually.  The seat belts are black or dark gray.
> The automatic belt can be disconnected from the door frame and will then roll down into the left-hand side of the passenger seat by the place that the lap belt, I believe, connects or starts from.

The district court's observations contradicted Kominsky's testimony in two important ways.  First, Kominsky simply was wrong about there being a non-automatic-type seatbelt in Alford's car.

---

THE COURT:  Do you have a memory of where the front seat passenger seat belt was?

KOMINSKY:  You'd <u>see the straps</u>, your Honor on the door that it's a lap -- the kind that comes across the shoulder, buckles on the seat, your Honor.

THE COURT:  And so where was the passenger side seat belt when Mr. Henderson was arrested?

KOMINSKY:  You'd see, on the door, sir, when he gets out of the car, <u>you can clearly see the seat belt is on the side of the door frame</u>.  You can see that clearly . . ..

THE COURT:  Was this the kind of seat belt that rolls back up into the frame and you pull it down?

KOMINSKY:  It's the strap kind, your Honor, the kind that you do pull out.

-14-

Second -- and even more important -- Kominsky's emphatic testimony about seeing Henderson's "seat belt [] on the side of the door frame," could not have been true. If the seatbelt had been connected, it would have been attached to the frame of the car, as described by the court. If it were disconnected, it would have rolled down into the left hand side of the passenger seat, also as described by the court. It was a physical impossibility for the strap to be in the position Kominsky described. As the district court itself immediately recognized:

> I think [Kominsky] testified, and I'll have to refresh my recollection -- that it wasn't an automatic seat belt. He remembered it hanging there after Mr. Henderson got out of the car. And whether it was connected or disconnected, it wouldn't have been hanging in the place that a non-automatic seatbelt hangs, in my experience. It either would have been pushed forward if it was connected or it would have been down by the left-hand waist if it was disconnected.

The government argues that Kominsky's testimony was not inaccurate because Alford's car had manual lap belts in addition to automatic seatbelts. This argument is unpersuasive because it parses Kominsky's testimony too finely. While Kominsky did testify that Henderson was not wearing a seatbelt across his lap, he also testified emphatically that Henderson "did not" have "a seat belt going diagonally across his chest." Kominsky never testified that he would give a seatbelt citation to someone wearing a shoulder belt but not a lap belt.

-15-

### b.  Number of citations

Kominsky testified at the first suppression hearing that he had issued "over a hundred" seatbelt citations "just in this last year."  To the government, and conceivably to the district court, this was important testimony.  The government placed great emphasis on the frequency of Kominsky's seatbelt citations as an explanation for the inaccuracy of his recollection about Alford's car.  In light of further questioning, however, neither Kominsky's tabulation nor the government's excuse held up.  Asked the same question at trial, Kominsky said that he averaged 25 citations, admitted the inconsistency, and said that he had misunderstood the question "how many seat belt violations have you written in the last year?"

As Henderson points out, the record plainly belies Kominsky's statement -- and the government's argument on appeal -- that he misunderstood the question before stating that he issued 100 seatbelt citations a year.  In response to follow-up questions at the first suppression hearing, Kominsky reiterated that he had written 100 seatbelt citations "just in the last year," and that he issued a seatbelt citation "every three days."  There was no confusion by Kominsky.

At the second suppression hearing, defense counsel again impeached Kominsky on this point -- with documentary evidence that Kominsky had averaged only fifteen seatbelt citations per year.

Kominsky again had an excuse: he had issued more citations but they were missing from computer records because of his bad handwriting.

### c. Henderson's attire

Kominsky testified that Henderson was wearing a dark-colored shirt on the night of the arrest. However, documentary evidence -- the inventory list from the jail where Henderson would spend the night -- proved that Henderson was wearing a white shirt. The government argues that the issue is immaterial and points out that Kominsky expressed no certainty when testifying about Henderson's attire. Still, the inaccuracy about the shirt, like the inaccuracy about the automatic seatbelts and the number of seatbelt citations he had written, provides a further ground for questioning Kominsky's credibility.

### 2. Inconsistent testimony: his motivations for demanding Henderson's identifying information

Henderson points out that Kominsky's testimony was inconsistent on the obviously pertinent matter of why Kominsky either asked for (in Kominsky's view) or demanded (in Henderson's view) his identifying information. At a detention hearing that occurred shortly after Henderson's arrest, Kominsky said that he secured the identifying information for two reasons: to see if Henderson could drive Alford's car and because Henderson was not wearing his seatbelt. At the first suppression hearing, Kominsky added a third reason: he said that he sometimes asked passengers

-17-

in stopped cars for their identification because: "If I feel like asking everybody in the car for their license, I will." Kominsky also indicated for the first time at the suppression hearing that he could request Henderson's identifying information in order to see whether he could drive even <u>after</u> Henderson denied having a license in his possession. At the second suppression hearing, the other officer on the scene, Oliveira, rejected this purported justification, saying that "naturally, he couldn't drive the vehicle" without presenting a valid license.

At the second trial, after the denial of the suppression motion, Kominsky reversed course twice more, first explicitly denying on direct examination that he had any reason to ask for Henderson's identification apart from the purported seatbelt violation, and then stating on cross examination that the seatbelt violation was his "primary" motivation, but that "[t]here's a number of reasons [] that I could ask him for his identification." The government rightly notes that this testimony at the second trial came in after the court ruled on the suppression motion, and hence cannot contribute to the clear error analysis. But the government says nothing to explain Kominsky's inconsistent testimony about his motivations before the district court made its findings. In any case, Kominsky's inability to remember consistently -- at any point in the proceedings -- why he demanded Henderson's identification is another negative factor in the

evaluation of his credibility.

### 3.   Implausible testimony: observations leading to the vehicle stop

As Henderson argued at length before the district court and repeats here, even if Kominsky had a legal basis for pulling Alford over, it is implausible that the events before the stop unfolded as he testified.  According to his testimony, Kominsky pulled behind a blue Nissan at the intersection of Plain Street and Waverly Park Avenue, which Kominsky testified was in Brockton, "40, 50 yards" from the West Bridgewater town line.  He said that the Nissan was going slower than the speed limit allowed, between 20 and 25 miles per hour.  Kominsky further testified at the first suppression hearing that while driving through West Bridgewater he saw the Nissan stray across the yellow center line at least twice -- and maybe as many as five times; typed the Nissan's license plate into his laptop computer (looking at the keyboard as he did); used the license plate number to search the Massachusetts Registry of Motor Vehicles database, which required the laptop to initiate a cellular phone call; waited "at a minimum, 20 seconds" for the computer to process the search (a search that he said often took several minutes to produce results); and, while still in West Bridgewater, received a computer report indicating that Alford, the registered driver of the car, had a suspended license.  Kominsky testified that he decided to stop the Nissan while he was still in

West Bridgewater, at the intersection of Plain Street and Belmont Street, but that he actually initiated the stop in East Bridgewater, because he was waiting for a moment when he would have a tactical advantage.[4] According to the undisputed testimony of Henderson's investigator, it takes no more than 49 seconds to travel at 20-25 miles per hour from the intersection of Plain Street and Waverly Park Avenue in Brockton, where Kominsky said he first saw Alford's car, to the intersection of Plain and Belmont Streets.

Everyone agrees that Alford was perfectly sober at the time of the stop. The uncontested evidence is that she was driving especially carefully because she knew that she was being followed by a police officer. Yet, according to Kominsky's testimony, he observed Alford drive the two left tires of her car across the center line of a straight street between two and five times -- over a distance of three tenths of a mile. At the same time, Kominsky said, he was conducting a computer search that often took several minutes to complete. All of this, according to Kominsky, happened in no more than 49 seconds. The idea that Kominsky could observe all of this in such a short time verges on physical impossibility.

Attempting to blunt Henderson's demonstration of this

---

[4]The transcript of the October 22, 2002 proceedings quotes Kominsky as saying: "I like to stop motor vehicles where I feel safe, where it's tactfully to my advantage." The court reporter apparently reproduced the word "tactically" as "tactfully."

implausibility, the government argues that Alford's testimony about the minutes leading to the stop was equally implausible. Alford said that at some point while she and Henderson were still in Brockton, Kominsky began following her. Alford testified that Kominsky was sitting at an intersection. When her car approached, he activated his cruiser's flashing lights. She stopped to allow Kominsky to pull out ahead of her, but Kominsky flashed his bright lights and then signaled for her to go ahead of him. After she passed by, she testified, Kominsky began following her. Kominsky followed for several minutes -- she thought it could have been as long as twenty minutes, but stated that she was not keeping track of the time and did not know -- and then pulled her to the side of the road.

In the government's view, Alford's statement that Kominsky may have been following her for as long as twenty minutes somehow shows Kominsky to be reliable about the minutes before the vehicle stop. This argument fails. Alford's testimony about the number of minutes Kominsky was following her was self-consciously uncertain. She only professed to be sure that Kominsky was following her for a fairly long time. Alford's testimony that Kominsky was following her for longer than he said relates a more plausible sequence of events than Kominsky's testimony. If Kominsky actually saw what he professed to see, it is virtually certain that he was following Alford for significantly longer than

-21-

49 seconds, which would mean that Alford's statement that Kominsky began following her while she was still some distance from West Bridgewater may have been correct. Indeed, the district court noted as an aside at sentencing that Kominsky "might have been off on the times" in his testimony about the minutes before the vehicle stop.

### 4. Testimony disbelieved by the district court

The district court disbelieved Kominsky on at least two important points relating to his initial encounter with Henderson, and on another matter relating to Kominsky's ability to testify accurately about his conduct and motivations during vehicle stops.

### a. A demand or a request

The district court disbelieved Kominsky on the question of whether he requested or demanded that Henderson write down his identifying information. Kominsky testified that "I observed that the passenger, who turned out to be Mr. Henderson, wasn't wearing a seat belt, and asked him if he had any identification on him . . . . He said 'no, I don't have any ID on me' . . . . I then asked him if he would mind writing down [his] name, date of birth, and Social Security number on a piece of paper . . . [which] he did." Kominsky said that when Henderson asked why he had to write down his identifying information, he said: "You're not wearing your seat belt, sir." At that point, Kominsky said, Henderson voluntarily "complied . . . He picked up a piece of paper. He used my pen. He

-22-

wrote down his information." Kominsky later clarified that he did not even think that there was a "legal way for me to force" a passenger in a stopped car to write down his identifying information in order to be cited for a seatbelt violation.

Alford contradicted Kominsky both as to whether he mentioned anything about a seatbelt violation to Henderson and as to whether Kominsky merely requested -- rather than demanded -- Henderson's information. She testified that when Henderson asked Kominsky why he needed to write down his social security number and date of birth, Kominsky responded: "Just write your fucking information on the paper before I snatch you up." Alford's testimony on this point was consistent. However, Alford related Kominsky's profanity only reluctantly, after the district court told her that she was "required" to state Kominsky's words accurately, "even if it's language we wouldn't ordinarily use." In its written findings, the district court said that after "Henderson told Kominsky that he did not have a license or any identification,"

> Kominsky instructed Henderson to write his name, date of birth, and social security number on a piece of paper. Henderson asked Kominsky why he had to provide that information. Kominsky did not answer the question, but insisted that Henderson give him the requested information.

Henderson I, 229 F. Supp. 2d at 37 (emphasis added). The district court indicated that this finding was significant. In talking to

-23-

counsel after the second suppression hearing, the district court noted its findings on these points before saying: "back on [sic] October, I didn't believe everything that Mr. Kominsky said and I still don't."

### b. Any statement by Kominsky at the scene about a seatbelt

On the important question of whether Kominsky said anything about a seatbelt violation while speaking with Henderson and Alford, the district court also specifically sided with Alford's testimony over Kominsky's. Kominsky testified that he told Henderson, after he asked why he had to write down his information, "You're not wearing your seatbelt, sir."

The district court found, to the contrary, that when "Henderson asked Kominsky why he had to provide that information[,] Kominsky did not answer the question." Later, speaking to counsel, the district court summarized the testimony on this issue and its finding: "Mr. Henderson says: 'Why do I need to give you that?' And according to Kominsky he says 'because you're not wearing a seat belt.' You don't find that in my [first decision on the motion to suppress]." On an issue directly relevant to Kominsky's insistence that Henderson was not wearing a seatbelt, the district court's finding was contrary to Kominsky's testimony.

### c. Profanity during the demand

The government avers that the district court made no finding as to whether Kominsky actually used the profanity Alford

ascribed to him. However, the district court orally indicated that it found Alford's testimony more credible than Kominsky's on this point as well, stating after hearing Bellas's account of Kominsky's language at the second suppression hearing that "my sense [is] that Officer Kominsky, you know, was not, well, was not likely to have been, you know, quite as polite in talking to Mr. Henderson as he [] described in his testimony." Whether or not the district court credited every word of Alford's quotation of Kominsky, the important point is that the district court again rejected Kominsky's credibility on an issue closely related to his insistence that Henderson was not wearing his seatbelt.

### d. The Bellas stop

The district court also disbelieved Kominsky's account of his interactions with Bellas, the high school student who testified that he had twice been stopped by Kominsky while driving on Plain Street from his school in Brockton to his home in East Bridgewater. According to Bellas, the first time he was stopped, Kominsky approached the car and said: "I smell marijuana. And he asked me how much marijuana had I smoked in the nighttime." Bellas denied having smoked marijuana. There is no indication that he had. Kominsky did not even perform any kind of sobriety check. Bellas testified that Kominsky then ordered him out of the car, told him that he "was going to jail" if he did not say where he was hiding marijuana, and then searched him in a "very physical manner."

-25-

Kominsky took off Bellas's shoes and unbuckled his pants, and did the same to Bellas's friend, a young man named Carlos Gomes Pereira, who was riding as a passenger. Then, Bellas said, Kominsky "ransacked" the car, throwing his schoolbooks and homework into the street, and pulling up the carpet. Lieutenant Rogers, the second-ranking officer on the West Bridgewater Police (subordinate only to Kominsky's father, the Chief), later confirmed that Bellas's belongings had been thrown into disarray and that the carpet had been dislodged. After completing his search and finding no contraband, Kominsky left Bellas's belongings in the street and told him he could go. Bellas went home, and the next day his parents took him to the police station and filed a complaint. Rogers, who investigated, told Bellas and his family that he had been the victim of a "profile" stop. Noting Rogers's comment and documents in evidence indicating that Kominsky stopped minority drivers at a higher rate than their proportion of the local population, Henderson argued to the district court that the "profile" remark suggested Kominsky's possible motive in stopping their vehicle and in investigating Henderson. Henderson and Alford are African-American.

Kominsky also pulled Bellas over a second time in the same area, purportedly to cite him for having a muffler that was too loud. The car was towed for unrelated reasons. Rather than giving Bellas a ride home, Kominsky made Bellas walk. When

-26-

Bellas's father complained again to Rogers, Rogers went to the tow yard with Bellas, found that the car's muffler was not loud, and voided the citation that Kominsky had issued. Kominsky admitted that he had stopped Bellas and searched him, and that he had not given Bellas any citation pursuant to the first stop. But Kominsky denied that he had been unduly aggressive during that stop or that he had asked about marijuana instead of asking Bellas for his license and registration.

The district court found Bellas's testimony more credible than Kominsky's. In its oral remarks after the second suppression hearing, after calling attention to the fact that it "didn't believe everything that Mr. Kominsky said," the district court stated: "in fact, I'm not inclined to believe his rendition of events with Bellas either. If I had the Bellas case in front of me it wouldn't be that hard." In its written findings, the district court stated that: "the court finds Christopher Bellas's testimony concerning Kominsky's conduct when Bellas was stopped to be more accurate than Kominsky's version of events." Henderson II, 265 F. Supp. 2d at 116. Again, the district court discredited Kominsky on an important issue even though the only evidence contrary to Kominsky's testimony was the testimony of a driver whom he had stopped.

### 5. Testimony contradicted by other police officers

In at least two ways relevant to the question of whether

-27-

Kominsky's testimony about Henderson's seatbelt was accurate, Kominsky's testimony was contradicted by other police officers. As the government points out, the district court did not explicitly resolve these contradictions. However, these contradictions are relevant to our inquiry, and, with respect to at least one of them, the district court did, in effect, reject Kominsky's account.

### a. Kominsky's language during the arrest

Oliveira contradicted Kominsky as to whether Kominsky used profanity while arresting Henderson. When the suppression hearing was opened for the final time, the parties informed the district court that Oliveira would testify that Kominsky used profanity during Henderson's arrest. (He did so testify at the second trial.) Kominsky, on the other hand, testified that he was polite throughout the encounter. The government now argues that this matter is immaterial because Oliveira's testimony did not occur until after the final decision on the motion to suppress. This argument is misleading. The district court knew that Oliveira would contradict Kominsky before it finally denied the motion. In fact, defense counsel presented the district court with the government's e-mailed statement that: "Oliveira stated [in a pre-trial conversation with the government] that he recalls in essence that Officer Kominsky used some form of the f--- word when asking Mr. Henderson to get out of the vehicle."

The district court declined to hear Oliveira's testimony

in person before reconsidering the suppression motion for the final time because "I don't need to hear any more to have a low regard for Officer Kominsky as a law enforcement officer."

### b. The conversation at the station

Kominsky also was contradicted on the important question of whether his shift supervisor on the night of Henderson's arrest, who considered himself Kominsky's mentor, provided Kominsky with an opportunity to fabricate his recollection that Henderson was not wearing a seatbelt. As we discussed above, Kominsky testified that he made a statement about the purported seatbelt violation while talking to Henderson at the scene. As already noted, the district court rejected this account. No other witness testified that Kominsky said anything about a seatbelt violation before returning to the police station. Oliveira testified that Kominsky said nothing about a seatbelt to him at the scene. Kominsky did not actually write a seatbelt citation until he returned to the station. The district court expressed interest in this sequence, telling defense counsel: "I told you that I'm interested in knowing what happened back at the station and whether there was any discussion about the ticket. Ordinarily, I don't call witnesses. But don't you want to ask [his shift supervisor] that?"

Philip Tuck, who was Kominsky's direct supervisor on the night of Henderson's arrest, testified at the second suppression hearing, largely at the district court's urging. Defense counsel

said: "I do not have any intention of calling Sergeant Tuck," immediately before the remarks by the district court above. After the district court again asked: "do you want to call Sergeant Tuck?" defense counsel agreed to call the witness, responding: "I'm happy -- yes, your Honor, I'll put him up on the stand." In the end, after some questioning by both counsel, the district court examined Tuck itself, at some length.[5]

Tuck said that he "felt a certain fondness for" Kominsky and watched out for him. Tuck testified that when Kominsky returned to the station with Henderson, he asked him why he had stopped Alford's vehicle and why he had asked Henderson to get out of the car. We reproduce that testimony in part:

> THE COURT: When Mr. Henderson was arrested, did you have some discussion with Mr. Kominsky about the law with regard to when you could properly ask a passenger for identification?
>
> TUCK: I believe I asked him his reason for having Mr. Henderson get out of the vehicle.
>
> * * *
>
> THE COURT: So is it fair to say you didn't hear about a seat belt before, or no seat belt before, Officer Kominsky came in with Mr. Henderson?
>
> TUCK: I believe that's probably a fair statement
>
> THE COURT: Then I think you told me a moment ago, you asked Officer Kominsky why he took

---

[5] Indeed, the district court questioned several of the witnesses, including Kominsky, at length.

-30-

Mr. Henderson out of the car or something to that effect?

TUCK: Yes, I did.

THE COURT: In connection with that, did you discuss what was necessary for that to have been lawful, as you understood the law?

TUCK: It would be a violation of some sort.

THE COURT: That there had to be a violation?

TUCK: Yes.

THE COURT: Was that discussed with Officer Kominsky on that evening?

TUCK: At some point, yes.

* * *

THE COURT: . . . I'm asking you to tell me what to the best of your memory was said in the conversation between you and Officer Kominsky? Apparently, if I understand your testimony right, you said, you know, what caused you to order him to go out of the car? What caused --

TUCK: How did this happen, or something like this.

THE COURT: And someplace in that conversation there was some discussion about what's necessary for that to have been lawful, right?

TUCK: That's correct, sir.

THE COURT: And now I'm asking you -- I guess I should ask you as a threshold matter, do you remember the chronology?

TUCK: Okay, I've got a vague recollection of the conversation that went along the lines of, you know, how did this come down or how did you end up with him out of the car or something along that line? And he indicated

-31-

that he had not [seen] a seat belt on.

Tuck also said that, while Alford's citation and Henderson's arrest on the old warrant were listed in the "daily log" kept by the police, nothing was listed there about a seatbelt violation (he also stated that this was not unusual).  Tuck said that he knew, while talking to Kominsky on the night of Henderson's arrest, that it was "a big deal" for the police department to make a federal felon in possession case and agreed that "whether there was a seatbelt violation or some other violation was important to the future of the case against Mr. Henderson."

The district court asked Kominsky about the same conversation.  To illustrate how markedly Kominsky's testimony differed from Tuck's, we reproduce the relevant exchange:

> THE COURT:  Did Sergeant Tuck ask you any questions?
>
> KOMINSKY:  Not really, that I can recall, your Honor.  Other than the basic information pertaining to Mr. Henderson.
>
> THE COURT:  Do you recall Sergeant Tuck asking you why you asked Mr. Henderson for his date of birth and identity?
>
> KOMINSKY:  No, sir.
>
> THE COURT:  Do you recall Sergeant Tuck discussing with you whether it was lawful to insist that a passenger provide identifying information so it could be run through the computer?
>
> KOMINSKY:  I did it again, sir, because Mr. Henderson wasn't wearing his seat belt.  It's a civil violation.

-32-

> THE COURT: Right now I'm asking you about your conversation with Sergeant Tuck. I'm not asking you --
>
> KOMINSKY: Okay.
>
> THE COURT: -- what happened on the spot. Do you understand that?
>
> KOMINSKY: Okay, your Honor, I'm sorry. Pertaining to Sergeant Tuck, no, he did not ask me about the identification process with Mr. Henderson pertaining to the seat belt.

The government argued before the district court that Tuck's testimony "evol[ved]" and that, after repeated questioning, Tuck was not sure what he specifically asked Kominsky, but only that there was an "understanding" reached in the conversation that "there had to be a violation." That argument prompted this response from the district court: "But why shouldn't I find his first answer to be more accurate than the evolving answer?"

Orally, the district court indicated that Tuck's testimony gave the court further pause about Kominsky's account of the events on the night of Henderson's arrest. Speaking on the record with counsel after the second suppression hearing, the district court articulated its concern:

> Then [Kominsky] got back to the station, he had a conversation with Sergeant Tuck who knows that if there's no seat belt violation or something similar that [Kominsky's] conduct [] is very problematic . . .. [C]onceivably back at the station Tuck and Kominsky talk. Tuck says why, why did you ask for his identifying information? Kominsky says, well, I always do that, or I do it whenever I feel like it. Then Tuck says you got a problem,

-33-

they might have contrived the seat belt excuse.

## 6. The district court's general impressions of Kominsky

Obviously, a court of appeals is not in as good a position as the district court to assess a witness's "demeanor and inflection." Anderson 470 U.S. at 575. That reality is an important impediment to the rejection of a district court's credibility determinations on appeal. Here, however, that impediment has little force. Every time the district court spoke generally about matters relating to Kominsky's "demeanor and inflection," it cast doubt on his reliability as a witness. We relate some notable examples and their contexts.

In response to a question by the government at the first trial, Kominsky stated that he had testified at the motion to suppress "about four days ago." In reality, Kominsky's testimony had been 22 days earlier. On recross examination, defense counsel followed up on this misstatement. When defense counsel raised the issue, Kominsky confirmed his belief that the suppression hearing had taken place "four to six days" earlier. Defense counsel asked Kominsky what day it was. He said: "Wednesday." It was actually Thursday. Defense counsel then asked: "Do you know what the date is today?" Kominsky responded: "No, I don't sir. I don't know the day or the month today. I'm sorry. I've lost it." The government later explained this testimony by telling the district court that Kominsky was sick.

-34-

Despite this excuse, the district court clearly was concerned about Kominsky's performance on the stand. After agreeing to grant Henderson a mistrial, the district court urged the government to "reconsider whether this federal case ought to be voluntarily dismissed. . .. [W]hether he's ill or not, we now have a federal case where the government's prime witness testified yesterday that he didn't know what month it was."

Kominsky was scheduled to testify on the first day of the second suppression hearing. However, Kominsky missed his scheduled appearance, again because he was sick. The district court refused to take Kominsky's word on this excuse. The district court also refused to believe that Kominsky's poor performance on the witness stand was a result of illness. In the district court's words:

> I'll tell you, you know, my law clerk said to me several days ago, it will be interesting to see Officer Kominsky on the stand when he's not sick. Because you may recall on Thursday, November 14, he thought it was Wednesday, he didn't know it was November, and he didn't know it was the 14th. And I said, I don't think he's going to be any better. And I'll leave it there for now. . . . But, you know, a police officer shouldn't be unnaturally anxious about coming to court and testifying.

(Emphasis added.) The court then insisted on questioning Kominsky's doctor about the new illness, which the doctor confirmed was a gastrointestinal infection.

Kominsky's subsequent performance did not improve the

district court's impression of him. As noted above, the district court stated before the second trial that it had "a low regard for Officer Kominsky as a law enforcement officer." Similarly, at sentencing, the district court said: "I'll candidly state that, in a general sense, I have disquiet about Officer Kominsky and the West Bridgewater police . . . . And the idea that the U.S. Attorney's office is bringing cases which in effect have 20-year mandatory sentences when there's no parole in federal court based on that kind of police work and that kind of testimony disturbs me."

The district court also was blunt about Kominsky's capacity to testify accurately. At sentencing, looking back at Kominsky's entire testimony during the proceedings, the district court summed up its impression: "Officer Kominsky, even if he were trying to tell the truth, is perhaps the worst law enforcement witness, who was trying to be candid, assuming he was trying to be candid, that I've ever encountered."

## D. **The evidence on the seatbelt issue**

The only evidence that Henderson was not wearing his seatbelt before Kominsky demanded his identifying information was the uncorroborated testimony of Kominsky. In his testimony before the district court, Kominsky was empirically wrong on three points, markedly inconsistent on at least one highly relevant point, implausible on another point, expressly disbelieved by the district

court on at least three and probably four points, and contradicted by other police officers on two important points (as to at least one of which the district court indicated orally that it was disinclined to accept Kominsky's story). In addition, Kominsky forgot the day of the week and month of the year while testifying in front of a jury in federal court. This performance prompted the district court to say that it had "disquiet" and was "disturb[ed]" about the case's very prosecution in federal court.

Yet Kominsky unwaveringly testified that Henderson was not wearing any seatbelt in the stopped car. On this ultimately crucial point, despite its serious reservations about Kominsky's credibility and his capacities as a law enforcement officer, the district court believed Kominsky because "other credible evidence" bolstered Kominsky's story. The district court did not explain what that "other credible evidence" was. The government does not contend that there was any "other credible evidence," apart from Kominsky's own testimony, to bolster the district court's finding. We cannot find that "other credible evidence" in the record.

Kominsky said that he told Henderson and Alford that Henderson was not wearing his seatbelt, as a justification for asking for his license. As we discussed above, the district court did not believe this story. No other witness indicated that Kominsky said anything about a seatbelt until he returned to the police station where, according to Tuck's testimony, Tuck advised

-37-

him that he would need to articulate a reason for investigating the passenger in a stopped car. As the district court observed to counsel: "He didn't write the seatbelt thing . . . [until] he went back and spoke to somebody." Kominsky also did not say anything to his supervisor on the radio about a seatbelt violation -- even though he did discuss the citation that he would give Alford for driving with a suspended license.

The government does not argue that Oliveira's testimony corroborates Kominsky's report that Henderson was not wearing his seatbelt. Indeed, the government does not argue that Oliveira was even on the scene of the vehicle stop in time to see whether Henderson was wearing his seatbelt during the stop. To do so, it would have to disbelieve Kominsky on the question whether Oliveira even arrived at the side of the car in time to see whether Henderson was wearing his seatbelt before Kominsky demanded Henderson's identifying information. At the first suppression hearing, Kominsky testified that "Officer Oliveira was arriving at the time that I was speaking to Mr. Henderson. He was pulling up behind us." At the second hearing, Kominsky said: "no, sir" when asked whether Oliveira was at the side of the car during his initial encounter with Alford and Henderson. It is true that Oliveira testified that he was at the car earlier than Kominsky and Alford said, and that he thought he would have remembered if Henderson was wearing a seatbelt and that he did not remember that

he was. However, Oliveira also testified that he did not "remember looking in [Alford's car] and making a mental note" whether Henderson was wearing his seatbelt. And Oliveira said that he had talked about the incident with Kominsky after the first trial ended in a mistrial, and that the issue of the seatbelt "may have come up." Finally, Oliveira testified that Kominsky did not say anything to him about a seatbelt while they were at the scene. For all of these reasons, Oliveira's testimony does not bolster Kominsky's account about Henderson's seatbelt.

Finally, the district court heard ample evidence that Kominsky had a tendency to exceed the proper bounds of a vehicle stop and to make unwarranted demands on drivers and passengers. This was the unmistakable import of the evidence about the Bellas stops, which the court credited. Tuck testified that Kominsky had amassed "more than the average" number of complaints about his conduct. Rogers testified that he had had to review proper vehicle stop procedures with Kominsky after concluding that Kominsky was overstepping the proper bounds of vehicle stops. Even as this case was ongoing, citizens were complaining about Kominsky's performance of his duties during vehicle stops. Kominsky himself testified: "If I feel like asking everybody in the car for their license, I will," even though, as the other officers testified, such conduct by a police officer was a violation of Massachusetts state law. All of these factors leave little doubt that Kominsky would have no

compunction about demanding Henderson's social security number and date of birth even if Henderson had not violated some law.

This is not a case in which a witness's inaccuracies were collateral. The most inaccurate parts of Kominsky's testimony -- the topics on which he testified with certainty but was clearly proven wrong -- relate directly to the officer's account of the vehicle stop of Alford and Henderson and to the short period during which he professed to observe Henderson not wearing his seatbelt. On every point relating to the stop where empirical evidence could contradict Kominsky, it did. Kominsky repeatedly insisted that Alford's car had standard manual seatbelts. The car itself proved otherwise. Kominsky recalled that Henderson was wearing a dark sweatshirt. The documentary evidence showed that he was wearing a light-colored one. Kominsky testified that he was perfectly polite during the vehicle stop. Both Alford and Oliveira testified otherwise, and the district court indicated orally that it believed them. Kominsky testified that Henderson voluntarily wrote down his identifying information. The district court concluded that he did not. Kominsky said that he had Henderson's purported seatbelt violation in mind from the moment he demanded his identification and said so. No other witness testified that Kominsky said anything about a seatbelt until after returning to the police station and being reminded that he could not investigate a vehicle passenger without cause. The district court said that it did not

-40-

believe Kominsky's statement to the contrary. On each of these points save the color of Henderson's shirt, Kominsky's testimony, though inaccurate, contradicted, or inconsistent, was just as emphatic as his testimony about Henderson's seatbelt. All told, in a record that runs well into the thousands of pages, there is nothing apart from Kominsky's own testimony to indicate that Kominsky was telling the truth about Henderson's seatbelt -- even though he was lying or mistaken about so many related facts.

In the end, the district court acknowledged the difficulty of believing Kominsky about the seatbelt. Considering only the information in the record after the first suppression hearing, the district court termed the issue of Henderson's seatbelt a "close" one. After hearing more information at the second suppression hearing that challenged Kominsky's account and credibility, the district court, although again denying the suppression motion, observed that: "the question whether Henderson was wearing a seatbelt . . . continues to be close." At sentencing, the district court said: "I two times found . . . that Mr. Henderson was not wearing a seat belt. That much of Officer Kominsky I credited. But, in candor, I'm not close to sure about that." Later, in the same hearing, the district court stated: "I might only be 55 percent sure of the facts."

What apparently tipped the balance for the court on the seatbelt issue was "other credible evidence" that somehow salvaged

Kominsky's badly damaged credibility. Yet neither the district court nor the government has specified what "other credible evidence" might bolster Kominsky's story. As indicated, we have not found that "other credible evidence" anywhere in the record.

We can understand the district court's continued uncertainty about its seatbelt finding. In light of all the factors we have discussed, and after a careful review of the record, we are left, respectfully, with "a definite and firm conviction that a mistake has been committed." Anderson, 470 U.S. at 575. Wholly dependent as it was on the credibility of Kominsky, the court's finding that the government met its burden of proving that Henderson was not wearing his seatbelt during the stop was clearly erroneous.

## III.

Anticipating the possible rejection of its seatbelt argument, the government asks us to conclude that Kominsky could demand Henderson's identifying information and conduct a computer search of his records "for reasons of officer safety." There may be cases where an officer is warranted in demanding a passenger's identification for safety reasons, but this is not one of them.

The scope and duration of a vehicle stop must be "'reasonably related [] to the circumstances that justified the [stop] in the first place'" unless the police have a basis for expanding their investigation. See United States v. Cook, 277 F.3d

-42-

82, 85 (1st Cir. 2002) (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968); see also United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001). It is also well established that a police officer cannot stop a citizen and demand identification "without any specific basis for believing he is involved in criminal activity." Brown v. Texas, 443 U.S. 47, 52 (1979). Attempting to establish that Kominsky's investigation of Henderson was not proscribed by these principles, the government cites cases in which certain "de minimis" intrusions on privacy have been allowed as a matter of course during vehicle stops.

The government emphasizes the Eleventh Circuit's holding in United States v. Purcell, 236 F.3d 1274, 1277-80 (11th Cir. 2001). In Purcell, the question was not whether a police officer could demand a passenger's identification. Instead, the question was whether a police officer could extend a vehicle stop by at most three minutes -- a period the same court later characterized as "de minimis" -- to run a criminal history check on identification he already had. United States v. Boyce, 351 F.3d 1102, 1107 n.4 (11th Cir. 2003). Furthermore, in Purcell, there were circumstances not present here that could have helped legitimate the police officer's particularized suspicions of the subject in that case. The car was stopped in "a very high crime corridor," and it was rented, but not to the driver of the car. See Purcell, 236 F.3d at 1280.

The Eleventh Circuit has clarified that Purcell should

not be read to legitimate extending vehicle stops in order to conduct investigations that are not related to the reason for the stop. See Boyce, 351 F.3d at 1107 (concluding that it was not reasonable for a police officer to prolong a vehicle stop for 12 minutes, to investigate the car for narcotics without reasonable suspicion for doing so).

The government relies also on three Supreme Court cases. The first two establish that the Fourth Amendment does not require that a police officer have cause to order the occupants of a vehicle to exit during a stop. See Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable seizures."); Maryland v. Wilson, 519 U.S. 408 (1997) (same for passengers). The premise of both of these cases is that ordering a person out of a car for the duration of a traffic stop, without more, is a minimal imposition on persons already detained. Such an order does not extend the duration of a traffic stop and represents only a "minimal" intrusion on privacy. See Wilson, 519 U.S. at 414-15.

In Hiibel v. Sixth Judicial District Court of Nevada, 542 U.S. 177 (2004), the final Supreme Court case the government cites, the Supreme Court rejected a challenge to a Nevada law requiring subjects of Terry stops to state their name. The Court held that

-44-

the Terry line of cases "permit a State to require a suspect to disclose his name in the course of a Terry stop."  Id. at 187 (emphasis added).  The demand in Hiibel survived Fourth Amendment scrutiny because it "does not alter the nature of the stop itself: it does not change its duration." Id. at 188.

The facts here are markedly different than the facts in any of these cases.  Most notably, Kominsky's demand for Henderson's identifying information and his subsequent investigation of Henderson expanded the scope of the stop, changed the target of the stop, and prolonged the stop.  Alford, not Henderson, was the subject of the initial stop.  According to Kominsky, Henderson was not detained at all prior to the demand for his identification; rather "he could have just walked away." According to Oliveira, it took Kominsky between ten and fifteen minutes to run a criminal history check on Henderson and longer, after that, to confirm the results of the check with the dispatcher.  Oliveira's time line is consistent with Alford's testimony that twenty minutes elapsed between Kominsky's demand for Henderson's information and his return to the car.[6]  As the officers testified, apart from the records check on Henderson, there was no other reason to prolong the stop.  Kominsky already

---

[6] Kominsky testified that he did not remember how long the records check took to process, but that it was "fairly quick."

-45-

knew everything that he wanted to know about Alford.[7]  The standard procedure in the circumstances, the officers testified, would have been to issue a citation to Alford, arrange to have the car towed, and let the driver and passenger leave the scene (either by foot or by a ride in a police cruiser to a place from which they could call a taxi).  Presumably, if Kominsky had not demanded Henderson's identifying information and investigated him, Henderson would have "just walked away."

There was no particularized reason, discounting the discredited seatbelt violation, for Kominsky to launch into an investigation of Henderson.  Kominsky might reasonably have asked Henderson for his license to see if he could drive the car back to Boston.  But when Henderson responded that he did not have his license, there was, as the district court found, no further reason to inquire about his ability to drive Alford's car back to Boston.  Henderson, of course, could not drive the car without producing a license.  Nor was there any other remotely particularized rationale for investigating Henderson.  Kominsky did not perceive any danger from Henderson, nor did Kominsky have any reason to suspect that Henderson was engaged in any kind of illegal activity.  The stop was not made in a dangerous location.  Alford's underlying traffic violation -- driving with a suspended license -- did not raise the

_____

[7] Kominsky emphatically reiterated that there was "no need in [his] mind to reenter [Alford's] name" into the computer database for a records check.

-46-

specter of criminal activity involving Henderson. Henderson was not acting suspiciously. Indeed, the government conceded to the district court that "the government is not contending in this case that Mr. Henderson at the time Officer Kominsky asked for identification was engaged in other suspicious conduct or that the evidence supports that." In light of these facts, the government's "officer safety" argument fails.

## IV.

The district court handled this difficult case with skill and care. Troubled by the government's belated disclosure of evidence pertinent to Kominsky's conduct at vehicle stops and other issues, the court declared a mistrial of Henderson's first trial and reopened the suppression issue. The court said that it was "disturb[ed]" about the government's reliance on the person it called "perhaps the worst law enforcement witness, who was trying to be candid, assuming he was trying to be candid, that I've ever encountered." The court stated: "I am concerned about the competence and practices of . . . Kominsky." Still, on the critical factual issue in this case -- whether to believe Kominsky's testimony that Henderson was not wearing his seatbelt -- the district court accepted Kominsky's account on the basis of "other credible evidence" not specified by the court or by the government.

In reviewing the record, we have found no such evidence.

-47-

Instead, we have found that Kominsky's testimony was riddled with implausibilities and inconsistencies, and that it was disbelieved by the district court in important respects and contradicted by law enforcement witnesses in others.  Under these circumstances, we are left with a firm and definite conviction that the district court's critical finding that Kominsky credibly testified that Henderson was not wearing a seatbelt was clearly erroneous.  The government established no other justification for Kominsky's investigation of Henderson's identifying information.  Therefore, we must reverse the order denying the motion to suppress and vacate the judgment of conviction.

**So ordered.**