# United States Court of Appeals
## For the First Circuit

No. 08-1205

UNITED STATES OF AMERICA,

Appellee,

v.

STEPHEN SCOTT,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Boudin and Lipez, Circuit Judges,
and Singal,[*] District Judge.

John M. Thompson for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, was on brief, for
appellee.

May 21, 2009

[*]Of the District of Maine, sitting by designation.

**SINGAL**, **District Judge**. In this appeal from a criminal conviction following a jury trial, appellant Stephen Scott asserts that the district court erred in denying his motion to suppress evidence seized following the execution of a state parole warrant for temporary custody ("WTC"). Specifically, Scott contends that the parole action, prompted by information received from law enforcement and executed with law enforcement officers, impermissibly circumvented the Fourth Amendment's probable cause requirement. For the reasons that follow, we affirm.

I.

We recount the relevant facts as the district court found them, consistent with record support. United States v. Graham, 553 F.3d 6, 9 (1st Cir. 2009).

In 2004, Scott was paroled from a Massachusetts prison sentence imposed following his conviction for drug trafficking and unlawful possession of a firearm. Massachusetts Parole Officer ("MPO") Lori Correia supervised Scott. As of October 2005, Scott was employed by Walmart and reporting as required; Correia believed him to be in compliance with the conditions of his parole.

In October 2005, a confidential informant told Martin O'Malley, a Worcester Police Department officer assigned to a joint federal-state Drug Enforcement Administration Task Force, that Scott wanted to purchase guns with obliterated serial numbers in exchange for crack cocaine. O'Malley determined that Scott had

-2-

previously been incarcerated, and the Task Force began an investigation.

On November 17, 2005, the Task Force arranged a controlled drug buy between the confidential informant and Scott, during which Scott allegedly sold the informant crack cocaine. Within days, O'Malley learned that a warrant had been issued for the informant's arrest on an unrelated charge. Consequently, the Task Force suspended its investigation of Scott.

During a monthly meeting of law enforcement agencies at Worcester Police Department headquarters on November 28, 2005, O'Malley confirmed with MPO John Deignan that Scott was on parole. He then asked Deignan whether the information obtained during the Task Force investigation could justify revocation of Scott's parole. Deignan suggested that it could, and requested copies of the Task Force's report regarding the controlled buy. He later conveyed the substance of this conversation to Correia.

On December 6, 2005, Correia received a faxed copy of the report. She then discussed the matter with her supervisor Felix Claxton, who authorized the WTC.[1] The district court characterized

---

[1] Massachusetts state law authorizes issuance of a WTC on the "belie[f] that a parolee has lapsed or is about to lapse into criminal ways or has associated or is about to associate with criminal company or that he has violated the conditions of his parole . . . ." Mass. Gen. Laws ch. 127, § 149A; see also Commonwealth v. Hinterleitner, 781 N.E.2d 71, 71 (Mass. App. Ct. 2003) (describing the standard for a temporary custody warrant as "reasonable belief that a parolee may have engaged in prohibited conduct and violated parole").

-3-

this decision as "essentially routine" under the circumstances. The WTC issued within two days.

On December 8, 2005, Correia, Deignan, and Claxton went to the Worcester Police Department headquarters to coordinate execution of the WTC with law enforcement. Four or five law enforcement officers, including O'Malley, planned to accompany the three parole officers to Scott's apartment. The district court later concluded that O'Malley's involvement was "not a coincidence."

That morning, the officers went to Scott's apartment. Correia knocked several times. After Scott did not respond, the officers forcibly breached the door and found Scott lying in bed; they also discovered marijuana in plain view. O'Malley advised Scott of his Miranda rights and asked if there were additional weapons or drugs in the apartment. Scott responded that crack cocaine and a firearm were present. After the apartment was secured, O'Malley sought and procured a judicial search warrant, the execution of which revealed crack cocaine and a firearm with an obliterated serial number.

On February 15, 2006, a federal grand jury in the District of Massachusetts returned a four-count indictment against Scott.[2] On September 28, 2006, Scott filed a motion to suppress

---

[2] The Indictment charged possession with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii) (Count One); possession of a firearm

-4-

the physical evidence discovered, as well as any statements made, during the December 8th search of his apartment. The district court conducted an evidentiary hearing, after which it denied the motion orally. With regard to Scott's allegation of improper coordination between the parole officers and law enforcement, the district court concluded that the Massachusetts Parole Board "initiated the warrant and arrest process." Furthermore:

> The fact that the police had initiated the investigation and supplied the information to the Mass[achusetts] Parole Board up to that point was not improper. To the contrary, it was routine and normal . . . . In other words, the Parole Board was not acting as agents [sic] of the police; to the contrary, the parole board was making the decisions, was in charge, and had what was in effect a police escort, even if that escort included an officer, who was the most knowledgeable about the activities of the defendant.

Scott filed a renewed motion to suppress, which the district court denied orally after hearing additional argument.

On October 19, 2007, a jury convicted Scott on Counts One, Three, and Four, and acquitted him on Count Two. On February 8, 2008, the district court sentenced Scott to a mandatory minimum term of imprisonment of 240 months followed by ten years of

---

in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1) (Count Two); unlawful possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k) (Count Three); and possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1) (Count Four).

supervised release.  This appeal of the court's suppression ruling followed.

## II.

When assessing the disposition of a motion to suppress, we review the district court's factual findings for clear error and its ultimate legal conclusions de novo.  Graham, 553 F.3d at 12. We will overturn those factual findings "only if, after reviewing all of the evidence, we have a definite and firm conviction that a mistake has been committed." United States v. Henderson, 463 F.3d 27, 32 (1st Cir. 2006) (citation and internal punctuation omitted). Ultimately, we will affirm the denial of a suppression motion "if any reasonable view of the evidence supports it." United States v. Rivera-Rivera, 555 F.3d 277, 283 (1st Cir. 2009).

Because Scott did not renew his suppression motion at trial, our review is limited to the evidence presented during the suppression hearing.  United States v. de Jesus-Rios, 990 F.2d 672, 675 n.2 (1st Cir. 1993).

## III.

The sole issue on appeal concerns the propriety of the law enforcement officers' participation in the parole action. Scott asserts that the Task Force officers impermissibly influenced both the acquisition and the execution of the WTC, in order to gain access to his apartment without first satisfying the Fourth Amendment's probable cause requirement.  In response, the

government maintains that the parole officers independently decided to seek the warrant and determined how to execute it; the Task Force officers served in a strictly auxiliary role. Challenges to the "integrity of a [parole] action" are necessarily "determinable as a question of fact on a case-by-case basis." United States v. Cardona, 903 F.2d 60, 65 (1st Cir. 1990).

In United States v. Cardona, we articulated various principles governing the participation of law enforcement officers in parole functions. Because such cooperation raises the possibility of subterfuge designed to evade the Fourth Amendment, we warned that the police may not use parole officers "as a cat's paw." Id. However, where "police officers function merely as instruments of the parole system, not as law enforcers per se," we determined that "they should be accorded the same privileges available to other operatives in the system." Id. at 69.

The core question on appeal, then, is narrow and inherently fact-specific: did the law enforcement officers' involvement in the parole action exceed the strictly instrumental role contemplated in Cardona?[3] As mentioned, Scott's evidence pertains to both the acquisition and the execution of the WTC. Regarding the preliminary decision to seek the warrant, Scott

_____

[3] Neither party invoked United States v. Knights, 534 U.S. 112 (2001), or Samson v. California, 547 U.S. 843 (2006), two relatively recent cases that modify the law underlying Cardona. Thus, we have no occasion to consider the implications of those cases here.

points to Officer O'Malley's instigation of the parole investigation, and subsequent transmittal of the Task Force report. Regarding the warrant's execution, Scott observes that a majority of the officers who executed the WTC, including O'Malley, were law enforcement officers. He also characterizes the officers' decision to execute the WTC at his apartment, as opposed to the parole office, as motivated by a desire to create a search opportunity for law enforcement. Scott insists that these facts, taken together, compel the conclusion that the parole action "was a law enforcement decision carried out by law enforcement means for law enforcement purposes."

We disagree. Considering first Scott's objection to the initial phase of the parole action,[4] we have long endorsed "mutually beneficial cooperation" between law enforcement and probation officers. United States v. Giannetta, 909 F.2d 571, 581 (1st Cir. 1990). Likewise, law enforcement officers may share relevant intelligence about a parolee's criminal activity with those parole officers responsible for his supervision. See Cardona, 903 F.2d at 63 (noting that "parolees enjoy even less of the average citizen's absolute liberty than do probationers"). Abiding these precepts, courts have routinely upheld probationary

_____

[4] We observe that the involvement of law enforcement in Cardona commenced only after the defendant's parole officer decided to seek a warrant and after the warrant issued. See 903 F.2d at 60-61.

-8-

and parole searches initiated on the basis of information provided by law enforcement.  See, e.g., Griffin v. Wisconsin, 483 U.S. 868, 871, 879-80 (1987); United States v. Grimes, 225 F.3d 254, 256, 259 (2d Cir. 2000); Giannetta, 909 F.2d at 573; see also Graham, 553 F.3d at 10 (information shared between probation officer and police); United States v. Williams, 417 F.3d 373, 375 (3d Cir. 2005) (information shared between parole officer and police); United States v. Reyes, 283 F.3d 446, 464-65 (2d Cir. 2002) (observing that "probation officers are quite properly advised that '[t]he original arresting agency and Federal task forces . . . can provide valuable assistance to the officer in monitoring the offender's activities while under supervision'"); 5 Wayne R. LaFave, Search and Seizure § 10.10(e), at 472 (4th ed. 2004) (describing probation and parole officers' salutary reliance on the police as a source of investigatory information).  Here, the district court characterized the Task Force's initiation of and contribution to the parole investigation as "routine and normal." Scott offers no reason to question that assessment.

Moreover, the district court's determination that the parole officers "initiated the warrant and arrest process" is amply supported by the record.  MPO Correia testified that she and Claxton decided to seek the WTC, that no law enforcement officer asked her to obtain the warrant, and that no law enforcement officer was present when the decision was made.  None of Scott's

evidence speaks to this critical decisionmaking phase, which we have previously identified as the Fourth Amendment's central concern in the context of parole. Cardona, 903 F.2d at 65-66; see Giannetta, 909 F.2d at 581 (focusing on the identity of decisionmaker in rejecting a "stalking horse" challenge to police officer's involvement in probation search). Thus, we conclude that the law enforcement officers' influence during the initial phase of the parole action was appropriate.

Scott also objects to the manner in which the WTC was executed. Our decision in Cardona effectively forecloses this line of argument. In that case, a parole violation warrant issued on a showing of reasonable suspicion in accordance with state law. Cardona's parole officer then asked the local police to execute it; as a result, three police officers, unaccompanied by any parole official, executed the warrant at the defendant's apartment. Upon entering the apartment, the police officers arrested the defendant and seized a firearm discovered in plain view.

In the course of affirming Cardona's arrest and conviction, we went so far as to state that had a single parole officer been present at the arrest, "Griffin would unarguably apply to defeat appellant's suppression claim." Cardona, 903 F.2d at 64. Here, three parole officials–Correia, Deignan, and Claxton–went to the Worcester Police Department headquarters to seek law enforcement assistance in executing the WTC, and then accompanied

four or five law enforcement officers to Scott's apartment. This sequence (and ratio) suggests significantly greater parole involvement than we licensed in Cardona.[5] Moreover, Scott offers no record evidence to substantiate his claim that "Task Force Officer O'Malley led the action" during the arrest itself. The mere fact that O'Malley questioned Scott about the presence of drugs or firearms, the basis of the possible parole violation, does not demonstrate that he was acting independently of the parole officers.

Finally, Scott invests the site of the arrest–his apartment–with excessive significance. It is true that MPO Correia might have requested Scott's presence at the parole office and executed the WTC there. But surely parole officials retain the discretion to execute a warrant in the manner they deem most likely to minimize the threat of violence, destruction of evidence, or flight. Furthermore, the decision to execute the WTC at the apartment did not, as Scott implies, create a full-blown search

---

[5] "Common sense" continues to "suggest[] that retaking parolees is apt to be a hazardous duty," which often requires law enforcement participation. Cardona, 903 F.2d at 68; see also United States v. Brown, 346 F.3d 808, 812 (8th Cir. 2003); Reyes, 283 F.3d at 468-70. And not only common sense: here, MPO Correia testified that parole officers always request police assistance when a parolee is allegedly involved in drug or firearm offenses, and MPO Deignan stated in his affidavit that parole officers routinely seek police assistance when making high-risk arrests. The arrest of Scott, who had been convicted of a firearm offense and was then reportedly seeking additional firearms, satisfies that standard.

-11-

opportunity: a valid parole arrest warrant permits only the seizure of a parolee, not the search of the room in which he is found. See Graham, 553 F.3d at 15; Cardona, 903 F.2d at 65 (requiring that "the executors, whoever they may be, will serve merely as agents of the decisionmaker, doing what the decisionmaker authorized, augmented only by the constitutionally permissible"). Thus, excepting the opportunity to seize evidence in plain view or pursuant to some other exception to the warrant requirement,[6] execution of a WTC at a parolee's home will not in most circumstances directly serve what Scott characterizes as "law enforcement purposes." We therefore conclude that the manner in which the warrant was executed complied with Cardona's insistence that police officers serve merely "in an agentival capacity" to the primary "decisionmaker," the parole officer. 903 F.2d at 65.

In sum, neither the acquisition nor the execution of the WTC violated the Fourth Amendment's probable cause requirement. Although law enforcement may not control the decisions of parole officers during either phase of a parole action, it may serve, in an auxiliary capacity, during both. On the record before us, we

_____

[6] Although a valid probation search may qualify as such an exception, it is not clear on the record that Scott was subject to this condition. See Graham, 553 F.3d at 15-18 (probationer informed of and consented to probation search condition). Thus, we cannot assume that law enforcement officers arrived at Scott's apartment empowered to conduct a search of the premises.

conclude that the Task Force officers so served, and therefore affirm the district court's denial of Scott's motion to suppress.