# United States Court of Appeals

## For the First Circuit

No. 08-2089

UNITED STATES,

Appellant,

v.

VINCENT CHANEY,

Defendant - Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, U. S. District Judge]

Before

Boudin, John R. Gibson,[*] and Howard,
Circuit Judges.

William E. Morse for appellant.
Robert Herrick for appellee.

October 15, 2009

---

[*]Of the Eighth Circuit, sitting by designation.

**JOHN R. GIBSON, <u>Circuit Judge</u>.** Vincent Chaney was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). Chaney moved to suppress the majority of the government's evidence against him, arguing that it was obtained in violation of the Fourth Amendment. The district court granted Chaney's motion to suppress and the government filed this interlocutory appeal. We reverse.

## I. Background

At 1:35 on the morning of Friday, June 28, 2007, Officer Aaron Brown of the Hooksett, New Hampshire Police Department, patrolling alone, observed a motor vehicle being operated without a working driver's side headlight. Officer Brown turned on his flashing lights to initiate a traffic stop and the driver complied by pulling to the side of the road. Officer Brown approached the driver's side of the vehicle, which was occupied by the driver and two other individuals. He explained to the driver, Renee LaFontaine, the reason for the stop and requested her driver's license and vehicle registration, which she provided. Officer Brown, while still standing at the driver's side door of the van, also asked the passenger, later identified as Vincent Chaney, for his identification and learned from the driver that the adolescent boy in the back seat was her son, Michael. At this point, only a minute or two had passed since Officer Brown initiated the traffic

- 2 -

stop.  Officer Brown testified that although Chaney had not done anything to suggest that he was dangerous, he requested Chaney's identification "as an officer safety function."

In response to Officer Brown's request, Chaney replied that he had left his identification at home.  Officer Brown then asked Chaney what jurisdiction had issued the identification and Chaney replied that he believed it was Massachusetts, but he was not certain.  Chaney gave the name, later determined to be false, of Jacob Williams and claimed his date of birth was July 5, 1972.  Officer Brown found it unusual that Chaney did not know what jurisdiction issued his official identification.  He then asked Chaney for his social security number, or the last four digits of it, which Chaney could not provide.  Officer Brown next asked Chaney for his current address, or at least the most recent of his addresses that he could recall.  Once again, Chaney could not remember the requested information.  Based on his experience, Officer Brown again found Chaney's inability to recall such information unusual.  Chaney's demeanor during this exchange was "uninvolved" and Officer Brown testified that Chaney primarily "stared straight ahead" and was "meek" in his behavior and mannerisms.  By contrast, Officer Brown testified that people in these situations generally make eye contact or at least engage in some sort of conversation with the officer.

Approximately seven minutes after the traffic stop was

initiated, Officer Brown returned to his cruiser to verify the information he received from the driver and Chaney. Officer Brown radioed the information to dispatch and requested a records check for license status and any outstanding warrants. He received the results of both records checks simultaneously, approximately ten minutes after he made the request. Officer Brown testified that the records checks could not be run simultaneously and that therefore approximately five of the ten minutes it took dispatch to respond were attributable to the check of Chaney's information. After he obtained the results of the records check, Officer Brown was able to verify the driver's information but was unable to match the information given by Chaney to any records in Massachusetts, New Hampshire, or New York.

Officer Brown returned to the driver's side of LaFontaine's vehicle and returned her license and vehicle registration to her. He then asked LaFontaine if she would mind stepping out of the van and speaking to him at the rear of the vehicle. Officer Brown testified that he asked LaFontaine out of the vehicle because he wanted to obtain her independent account of the passenger's identity. LaFontaine agreed, and the two stepped to the rear of her vehicle. Officer Brown questioned LaFontaine about the front passenger's identity, how she knew him, where they were coming from, and what they were doing. LaFontaine indicated that she knew the passenger as Jake, and did not know his last name. She

explained that she met "Jake" around five years earlier, but had lost touch with him until recently. Lafontaine said that when she recently spoke with "Jake" they decided they would hang out, go for a ride, and talk. She stated that when the officer pulled them over, they were headed to drop "Jake" off at his home on Spruce Street. Officer Brown then left LaFontaine and approached the passenger side of the van to speak with the passenger, Chaney.

Officer Brown explained to Chaney that the information he provided did not check out. Officer Brown also told Chaney that, based on his nervous demeanor and inability to provide an address or social security number, that he suspected Chaney of providing a false name. Chaney continued to assert that his name was Jacob. He became increasingly nervous, fidgety, and continued to avoid eye contact. As Officer Brown was talking with Chaney, he shined his flashlight into the car and observed a significant bulge, about the size of a fist, in the right front pocket of Chaney's jeans. At this point, Officer Brown was concerned that the bulge might be a weapon. He was also suspicious of criminal activity, given his belief that Chaney had provided false information.

Officer Brown pointed out the bulge to Chaney and asked what was in that pocket. At first, Chaney didn't respond and became increasingly nervous. Officer Brown repeated his question, at which point Chaney shifted his weight, reached into his right rear pocket and produced a big wad of napkins. He then said that

nothing was in his pocket and fumbled with the napkins in his hand. Officer Brown observed that as Chaney moved, the bulge in his right front pocket remained rigid. Officer Brown then redirected Chaney to his right front pocket and Chaney again indicated that nothing was in the pocket. Chaney then took the napkins in his right hand and shoved them in his right front pocket. As he did, Officer Brown observed that the bulge in Chaney's pocket moved lower into the pocket.

Officer Brown opened the door and asked Chaney to step out of the vehicle. He informed Chaney that he was going to conduct a "Terry pat" on him. Officer Brown brought Chaney to the rear of the vehicle to conduct the pat-down search. At this point, another officer, Officer Megowan, had arrived on the scene. Officer Brown explained to Chaney that he was only going to pat down his outer person by touching and feeling his pockets. Chaney's body language then became extremely rigid, and he began to clench his teeth. Officer Brown asked Chaney a third time what was in his pocket. This time Chaney responded that there were syringes in his pocket because he is a diabetic. Officer Brown asked if the syringes were capped, and Chaney stated that he was unsure. Officer Brown informed Chaney that he was going to retrieve the syringes. Because of Chaney's change in body language, Officer Brown feared that he might fight or flee, and he placed Chaney in handcuffs. He emphasized to Chaney that he was not under arrest, and Chaney

indicated that he understood.

Officer Brown then went directly to pat-down Chaney's right front pocket and he squeezed the item in question. He told Chaney that the item did not feel like syringes, and Chaney responded that it must be his diabetic kit. Officer Brown removed the item, which was a small black pouch with the word "KELTEC" on the side. Officer Brown recognized the container as a firearm pouch and opened it. Inside was a loaded Keltec pistol. Officer Brown asked Chaney if he had a permit to carry the weapon and Chaney indicated that he did not. Chaney was placed under arrest and eventually provided his actual name and date of birth.

Chaney entered a conditional plea of guilty to being a felon in possession of a firearm, preserving his motion to suppress evidence obtained during the traffic stop. The district court granted Chaney's motion to suppress, and this interlocutory appeal by the government followed.

## II. Discussion

The government argues that the district court erred in granting Chaney's motion to suppress evidence obtained during the stop. The district court concluded that Officer Brown's inquiries into Chaney's identity unreasonably expanded the scope of the traffic stop in violation of the Fourth Amendment. When reviewing a district court's grant of a motion to suppress, "[w]e review the

court's findings of fact for clear error and the application of the law to those facts de novo." United States v. Siciliano, 2009 WL 2605704, at *8 (1st Cir. 2009) (internal quotation marks and citation omitted).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop constitutes a seizure of "everyone in the vehicle" for purposes of the Fourth Amendment and thus must be supported by reasonable suspicion that a traffic violation has occurred. See Brendlin v. California, 551 U.S. 249, 255 (2007). During an otherwise valid traffic stop, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop, [the Supreme] Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 129 S.Ct. 781, 788 (2009). "To justify a patdown of the driver or a passenger during a traffic stop, however, . . . the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." Id. at 784.

Here, Chaney does not dispute that the traffic stop was valid at its inception. Rather, he challenges Officer Brown's inquiries into his identity, claiming that those actions unreasonably extended the duration of the traffic stop. In

- 8 -

response, the government argues that Officer Brown's original request for Chaney's identification, and the first few follow-up questions that ensued, did not unreasonably extend the duration of the stop and were justified based on officer safety concerns. Following Chaney's implausible answers to Officer Brown's initial requests, the government argues, Officer Brown had reasonable suspicion to investigate further into Chaney's identity. All of the officer's subsequent actions, according to the government, were individually justified as the situation unfolded. The district court rejected the government's assertions as foreclosed by this Court's decision in United States v. Henderson, 463 F.3d 27 (1st. Cir. 2006), and granted Chaney's motion to suppress. Specifically, the district court concluded that Henderson prohibited Officer Brown from making any inquiry into Chaney's identity based solely on concerns of officer safety and without reasonable suspicion. We disagree.

In Henderson, an officer initiated a routine traffic stop at about ten o'clock in the evening. 463 F.3d at 28. During the course of the stop, the officer "demanded" the passenger's driver's license. Id. at 29. When the passenger stated that he did not have a license, the officer demanded that he write down his name, date of birth, and social security number. There was testimony that the officer refused to explain why he was requesting the information and that he cursed repeatedly during the encounter.

- 9 -

Id. at 36-37. The officer gave conflicting testimony as to his reasons for demanding the passenger's identification, including that he was going to issue the passenger a seatbelt citation and that he wanted to determine whether the passenger could drive the vehicle. Id. at 34-35. The officer did not cite, nor did the government assert, "officer safety" as a justification for requesting the passenger's identification at trial. On appeal, the Henderson Court found the officer's testimony wholly incredible concerning the reasons he gave for demanding the passenger's identification and conducting the subsequent records check. Id. at 45. With the justifications given at trial discredited, the government urged the court to nonetheless conclude that the officer's actions were justified based on concerns of officer safety. Id. at 45.

The Henderson Court rejected the government's post-hoc "officer safety" rationalization which had no basis in the record. Id. at 46-47. In doing so, the court focused on the entire delay caused by the questioning and records check, amounting to approximately twenty minutes, and found no reasonable justification for the officer's actions in extending the stop by that much. Id. at 46.

Here, unlike in Henderson, the officer testified that he requested the passenger's identification based on safety concerns. Officer Brown was the only officer on the scene and was outnumbered

three to one by occupants of the vehicle. The stop occurred in the early morning hours and Officer Brown was one of only three officers on duty, with each being assigned to different sections of town. Officer Brown also indicated that requesting identification allowed him to know more about who he was dealing with and protect not only himself, but also the other occupants of the car. Officer Brown's testimony was consistent and his credibility was not meaningfully challenged.

Although Henderson at times spoke more broadly, its holding was limited to a conclusion that a delay of approximately twenty minutes to perform a records check on a passenger of a vehicle, without a basis for individualized suspicion, unreasonably extended the duration of an otherwise valid traffic stop. This case is distinguishable. Here, Officer Brown had developed reasonable suspicion to investigate Chaney further after only a minute or two, and all of his actions thereafter were justified as the situation unfolded. Therefore, the delay of approximately two minutes that occurred prior to Officer Brown developing reasonable suspicion to further investigate Chaney's identity was de minimus and did not unreasonably extend the duration of the traffic stop.

Nonetheless, Chaney argues that Henderson prohibits an officer from making any inquiry into a passenger's identity, including asking for official identification, unless the officer has reasonable suspicion that the particular passenger is dangerous or

involved in criminal activity. Chaney's interpretation of Henderson, however, relies on dicta and is in conflict with Supreme Court precedent. The Supreme Court has explained that it is "too plain for argument" that the justification of officer safety is "both legitimate and weighty." See Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977). Noting the inherent dangers of a traffic stop, the Supreme Court has allowed officers to, as a matter of course, take the arguably more intrusive step of ordering passengers out of a vehicle during a valid traffic stop without any individualized suspicion or justification. See Maryland v. Wilson, 519 U.S. 408, 415 (1997). More recently, the Supreme Court emphasized that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Johnson, 129 S. Ct. at 788.

Here, the officer's initial inquiries into Chaney's identity took at most a minute or two and did not measurably extend the duration of the stop. Any additional delay, including that attributable to the records check, was independently warranted by the officer's reasonable suspicion, based on Chaney's implausible answers and nervous demeanor, that Chaney was giving a false name and might be involved in other criminal activity. See United States v. Smith, 164 Fed. Appx. 825, 828 (11th Cir. 2006) ("[t]he

- 12 -

continued detention of the vehicle . . . reasonably warranted the intrusion" where officer suspected passenger of giving false name based on passenger's body language and inability to provide social security number).  In addition, Officer Brown testified that in his experience, people sometimes give a false name when they are carrying a concealed weapon without the required permit.  Officer Brown's actions continued to be justified after learning that the information Chaney gave did not match records in any of the surrounding jurisdictions.  Under the circumstances, then, it was reasonable to undertake further questioning of Chaney and LaFontaine to determine Chaney's identity and the reasons he might have given false information.  See United States v. Decker, 292 Fed. Appx. 752, 753 (10th Cir. 2008) (unpublished decision) (upholding denial of motion to suppress where officer questioned passenger about identity, records check demonstrated passenger gave false name, and officer observed contraband after returning to vehicle to further question passenger about his identity).

When Officer Brown saw the bulge in Chaney's pocket, he was justified in questioning Chaney about the pocket's contents.  See Mimms, 434 U.S. at 110 (finding reasonable suspicion that individual may be armed based solely on officer's observance of bulge in defendant's jacket).  Chaney's evasiveness and failure to identify what was in his pocket, coupled with the size and rigid nature of the object, gave Officer Brown a specific articulable

basis for suspecting that Chaney might be armed, thereby justifying a pat-down search.  See United States v. Greene, 129 F.3d 1252 (Table), 1997 WL 642275 at *2 (1st Cir. Oct. 14, 1997) (finding reasonable suspicion to support pat-down search of passenger where passenger was nervous and officer observed bulge in passenger's right front pants pocket).  Chaney then indicated that he had uncapped needles in his pocket, further justifying that he be handcuffed during the search.  Officer Brown went directly for Chaney's pocket, where he had observed the bulge, and recovered a firearm.

We conclude that Officer Brown's actions were reasonable at all times during the stop.  His initial few questions concerning Chaney's identification were allowable officer safety measures, not themselves requiring any individualized suspicion of Chaney, but rather justified based on the inherent dangers of the motor vehicle stop and the officer's need to orient himself to who and what he may be dealing with.  His actions thereafter were each justified by reasonable suspicion warranting further investigation and were related in nature and scope to dispelling the officer's legitimate concerns.  The Fourth Amendment was not violated.


## III.  Conclusion

For the foregoing reasons, the judgment of the district court is reversed and this case is remanded for further

proceedings.