# United States Court of Appeals
## For the First Circuit

No. 09-1058

UNITED STATES OF AMERICA,

Appellee,

v.

LAMONT FERNANDEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Boudin, Stahl and Lipez, Circuit Judges.

Thomas J. Iovieno for appellant.
Cynthia A. Young, Assistant United States Attorney, with
whom Michael K. Loucks, Acting United States Attorney, was on
brief, for appellee.

April 1, 2010

**LIPEZ, Circuit Judge**. This case raises an important question of Fourth Amendment law that is unresolved in this circuit: whether a police officer may request identifying information from passengers in a vehicle stopped for a traffic violation without particularized suspicion that the passengers pose a safety risk or are violating the law. Appellant Lamont Fernandez conditionally pled guilty to being a felon in possession of a firearm after the district court refused to suppress a gun recovered from him following a traffic stop of a car in which he was a passenger. The handgun was discovered after a police officer asked Fernandez for identification, ostensibly to issue a citation under a state seat belt law, and a computer check revealed an active warrant for his arrest. On appeal, Fernandez argues that the district court erred in failing to find that the inquiry into his identity violated both state law and his Fourth Amendment rights. Concluding that the questioning was lawful, we affirm.

**I.**

We draw the underlying facts from the findings made by the district court, see United States v. Fernandez, 578 F. Supp. 2d 243, 244-46 (D. Mass. 2008), and the testimony presented at the suppression hearing. At about 4:30 p.m. on October 20, 2007, Officer Anthony Pistolese was sitting in a parked cruiser across the street from a liquor store in Taunton, Massachusetts, when he observed a red Dodge Magnum pull into the store's parking lot just

-2-

before three men, two on bicycles and one on foot, arrived there. The man on foot got into the car and the others pedaled away.

The Dodge then pulled out of the parking lot onto Bay Street, cutting off a blue pickup truck that was driving in the same direction. Officer Pistolese testified that the truck's driver was forced to apply the brakes and swerve to avoid a collision. The officer immediately activated his siren and overhead emergency lights, and pulled the car over. Once the red car stopped, the officer remained in his cruiser for "[l]ess than two minutes" to initiate a computer check on the license plate number, and then approached the vehicle.

Pistolese asked the driver to roll down the windows, which were tinted, and he could then see that three men were inside and that none of them was wearing a seat belt. Appellant Fernandez was in the front passenger seat. The officer asked the driver for his license and registration, and asked the two passengers for their names and dates of birth. Pistolese testified that he wanted the passengers' identification information so that he could cite all three men for seat belt violations, pursuant to Mass. Gen. L. ch. 90, § 13A, in addition to citing the driver for a moving violation.

Pistolese returned to his cruiser to check for active warrants and received the information from dispatch that there was a warrant for Fernandez, but not for the other two men. Officer

Jeffrey Arruda had arrived at the scene while Pistolese was calling in the identification information, and he offered to provide back-up assistance. He pulled his cruiser behind Pistolese's vehicle, which was parked about 20 to 25 feet behind the Dodge. A third officer, Sean Smith, arrived on the scene and parked his cruiser in front of the Dodge. All three officers approached the car.[1] At Smith's request, Fernandez got out of the vehicle, and Arruda noticed "a large weighted object" on the right side of his shorts. Arruda removed the object, a loaded handgun, from Fernandez's waistband. A further search of Fernandez, the other two men, and the car itself turned up a bag of marijuana, two small bags of cocaine, and another firearm. The three men were charged with firearms and narcotics violations in Massachusetts state court and issued citations for failure to wear seat belts. The driver,

---

[1] The district court found that Smith arrived at the scene shortly after Arruda. At the suppression hearing, Arruda testified that, after he parked behind Pistolese's cruiser, he walked up to Pistolese's passenger-side window and "[i]t was at that time [Pistolese] indicated that Mr. Fernandez had an active warrant." Arruda was asked what he did as a result of that information. He replied:

> Another officer was coming to assist us, Officer Sean Smith. After the arrival of Officer Sean Smith, myself and Officer Pistolese began to walk towards the vehicle. Officer Pistolese walked to the driver's side. I walked to the passenger side where Mr. Fernandez was.

Smith, who was parked in front of the Dodge, approached the car from the other direction.

Thomas Young, also was issued a citation for failure to yield to oncoming traffic.

Fernandez was subsequently indicted in federal court on a charge of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1), and the state charges were dismissed. He moved to suppress the firearm on the ground that he was unlawfully stopped and questioned. He contended, inter alia, that both the initial stop of the car and the request for his identity were improper under Massachusetts and federal law. In denying the motion after a hearing, the district court observed that recent Massachusetts cases indicate that officers may issue citations for seat belt violations even if they have not seen the passengers with unfastened seat belts while the vehicle was moving. The court thus held that "[i]t was not improper for Officer Pistolese to ask Fernandez for his name and date of birth." Fernandez, 578 F. Supp. 2d at 248.

Fernandez subsequently entered a conditional guilty plea, reserving his right to appeal the suppression issue. The district court imposed a fifty-seven-month term of imprisonment and a three-year term of supervised release. This appeal followed.

**II.**

Fernandez no longer challenges the propriety of Officer Pistolese's initial stop of the car, focusing instead on the officer's request that Fernandez provide his name and date of

birth.  He argues that, as a matter of Massachusetts law, the officer had no right to question him in connection with a suspected seat belt violation, and he contends that there was no other justification for the inquiry into his identity.  Thus, he argues, the request for identification violated his Fourth Amendment rights.

When reviewing a district court's suppression ruling, we examine its findings of fact for clear error and its conclusions of law de novo.  United States v. Scott, 566 F.3d 242, 245 (1st Cir. 2009).  We will "affirm the denial of a suppression motion 'if any reasonable view of the evidence supports it.'"  Id. (quoting United States v. Rivera-Rivera, 555 F.3d 277, 283 (1st Cir. 2009)).  We find it unnecessary in this case to delve into the mechanics of Massachusetts' seat belt law because, as we shall explain, the lawfulness of Officer Pistolese's request for Fernandez's identification does not depend on whether he properly could be cited for a seat belt violation.  See United States v. Graham, 553 F.3d 6, 17 (1st Cir. 2009) (noting "the uncontroversial principle that federal law governs the admissibility of evidence in federal prosecutions") (internal quotation marks omitted).[2]

---

[2] In declining to address the state law question, we offer no view of the district court's interpretation of Massachusetts law. We choose to address the lawfulness of police questioning of passengers involved in traffic stops more broadly because the issue is both important and recurring.  See, e.g., United States v. Chaney, 584 F.3d 20, 25-26 (1st Cir. 2009); United States v. Henderson, 463 F.3d 27, 31 (1st Cir. 2006); see also Estrada v.

-6-

## A. Legal Background

The Supreme Court has long viewed the typical traffic stop to "resemble, in duration and atmosphere, the kind of brief detention authorized in Terry [v. Ohio, 392 U.S. 1 (1968)]." Berkemer v. McCarty, 468 U.S. 420, 439 n.29 (1984); see also Arizona v. Johnson, 129 S. Ct. 781, 786 (2009). Like the reasonable suspicion that criminal activity is afoot in the Terry context, the detection of a traffic violation permits officers to effect a limited seizure of the driver and any passengers consistently with the Fourth Amendment. See Johnson, 129 S. Ct. at 788; Brendlin v. California, 551 U.S. 249, 255 (2007) (holding that "during a traffic stop an officer seizes everyone in the vehicle, not just the driver"); United States v. Chaney, 584 F.3d 20, 24 (1st Cir. 2009).

The Court has explicitly extended Terry principles to the traffic-stop context and allowed officers to take similar measures to protect their safety, notwithstanding modest additional intrusion on the privacy rights of drivers and passengers. See generally Johnson, 129 S. Ct. at 786 (describing Terry's application in a traffic-stop setting); see also id. at 787 (noting that, "'as a practical matter, the passengers are already stopped

Rhode Island, 594 F.3d 56, 63 & n.15 (1st Cir. 2010) (noting that "our Circuit has not conclusively decided" whether it is unlawful for an officer to request identification from the passengers in a traffic stop).

-7-

by virtue of the stop of the vehicle,'" so "'the additional intrusion on the passenger is minimal'") (citations omitted). Thus, the Court has held that officers may order the driver and any passengers to get out of the car until the traffic stop is complete, see Maryland v. Wilson, 519 U.S. 408, 415 (1997); Pennsylvania v. Mimms, 434 U.S. 106, 111 & n.6 (1977) (per curiam) (citing Terry as controlling), and the officers may conduct a frisk for weapons upon reasonable suspicion that the car's occupants are armed and dangerous, Johnson, 129 S. Ct. at 787.

The Court has further "recognized that traffic stops are 'especially fraught with danger to police officers,'" id. at 786 (quoting Michigan v. Long, 463 U.S. 1032, 1047 (1983)), and that all occupants of a vehicle pose a safety risk, Wilson, 519 U.S. at 413. The Court acknowledged that the driver is in a unique position because "[t]here is probable cause to believe that [he or she] has committed a minor vehicular offense," while "there is no such reason to stop or detain the passengers." Id. Importantly, however, as reiterated by the Court in Johnson,

> the risk of a violent encounter in a traffic-stop setting "stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop." . . . "[T]he motivation of a passenger to employ violence to prevent apprehension of such a crime . . . is every bit as great as that of the driver."

129 S. Ct. at 787 (quoting Wilson, 519 U.S. at 413-414).

-8-

Of particular significance in this case is the Court's guidance in Johnson, its most recent traffic-stop decision, on the permissible scope of such stops. The passenger there, Johnson, was in a vehicle that had been stopped because of a suspected car-registration violation. Johnson was frisked by an officer who was concerned about the scanner she saw in his pocket, which the officer considered a possible indication of criminal activity, and his clothing, which the officer viewed as consistent with gang membership. Id. at 785. The patdown revealed a gun, and Johnson was subsequently convicted for unlawful possession of the weapon. Id. The Arizona Court of Appeals reversed the conviction, concluding that the frisk violated the Fourth Amendment because it resulted from an "unrelated investigation" into Johnson's possible gang affiliation, without reason to believe that he was involved in criminal activity. Id.

The Supreme Court reversed. It held that, because the traffic stop itself was proper, the frisk of Johnson would have been lawful if based on reasonable suspicion that he was armed and dangerous. 129 S. Ct. at 787.[3] Speaking unanimously, the justices rejected the Arizona court's ruling that the officer's encounter with Johnson was outside the scope of the original traffic stop. The Court stated that "[t]he temporary seizure of driver and

---

[3] The Arizona Court of Appeals had assumed, without deciding, that the officer had reasonable suspicion that Johnson was armed and dangerous. Id. at 788 n.2.

passengers ordinarily continues, and remains reasonable, for the duration of the stop," ending "when the police have no further need to control the scene."  Id. at 788.  The Court tersely asserted that its precedent "made plain" that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."  Id. (citing Muehler v. Mena, 544 U.S. 93, 100-101 (2005)); see also Mena, 544 U.S. at 101 (stating that "'mere police questioning'" does not on its own constitute a seizure that requires reasonable suspicion (quoting Florida v. Bostick, 501 U.S. 429, 434 (1991))).

The precedent leading to the Court's decision in Johnson establishes that the "unrelated" matters an officer may probe include the identity of the detained individuals.  The Court repeatedly has held that police requests for identifying information typically do not trigger Fourth Amendment concerns. See Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 185 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment."); INS v. Delgado, 466 U.S. 210, 216 (1984) ("[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.").  In Mena, the Supreme Court confirmed that independent justification for

identity inquiries also is unnecessary when a lawful detention is underway, unless such questioning prolongs the detention. Mena, 544 U.S. at 101 (noting that, where questioning did not extend the detention, "there was no additional seizure within the meaning of the Fourth Amendment," and, "[h]ence, the officers did not need reasonable suspicion to ask Mena for her name, date and place of birth, or immigration status").

Although the Court has not explicitly held that an inquiry into a passenger's identity is permissible, its precedent inevitably leads to that conclusion. The Court stated in Hiibel that "[o]btaining a suspect's name in the course of a Terry stop serves important government interests" because "[k]nowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder." 542 U.S. at 186. To the extent a risk of violence may be tied to such background characteristics, the officer is equally vulnerable whether these characteristics apply to a driver or a passenger. Moreover, as we recently observed in rejecting a passenger's claim that inquiries into his identity unreasonably extended a traffic stop, "the Supreme Court has allowed officers to, as a matter of course, take the arguably more intrusive step of ordering passengers out of a vehicle during a valid traffic stop without any individualized suspicion or justification." Chaney, 584 F.3d at 26.

With these principles in mind, we consider Fernandez's contention that the inquiry into his identity violated his Fourth Amendment rights.

## B. The Questioning of Fernandez

Fernandez concedes the lawfulness of the traffic stop, which initiated the seizure of him and the two other occupants of the car. Officer Pistolese asked the driver and both passengers for their identifying information at the same time, and he then returned to his cruiser to check for active warrants. So far as the record shows – and Fernandez does not argue otherwise – Pistolese discovered the active warrant for Fernandez as part of the same radio communication in which he learned that neither of the other two men had backgrounds requiring further action.[4] Hence, neither the request for Fernandez's identity – permissible under the precedent cited above – nor the records check prolonged the duration of the original stop. The encounter was extended only after the active warrant was discovered, at which point the further detention of Fernandez was independently justified. In these circumstances, no Fourth Amendment violation occurred.

---

[4] The district court described the warrant-check as follows:

After Officer Pistolese returned to his cruiser to check for outstanding warrants, he discovered that Thomas Young ("Young"), the driver of the car, and the backseat passenger did not have warrants but that Fernandez did.

578 F. Supp. 2d at 245.

-12-

Our decision in United States v. Henderson, 463 F.3d 27 (1st Cir. 2006), is not to the contrary. In Henderson, an officer also obtained a passenger's driver's license during a traffic stop, but, in a significant departure from the facts here, the ensuing criminal history check of the passenger, Henderson, lasted approximately twenty minutes. Id. at 46. The officers testified that the detention was extended solely to accomplish the check of Henderson's records. Id. We concluded that prolonging the stop without any particularized rationale for investigating Henderson violated his Fourth Amendment rights. Id. at 46-47.

We similarly distinguished Henderson in Chaney, emphasizing that the officer who conducted the traffic stop in Chaney had quickly developed reasonable suspicion to investigate further after asking a passenger, Chaney, for his identification. 584 F.3d at 26.[5] Anticipating the decision that we reach here, we concluded that the officer's interaction with Chaney was reasonable throughout the stop, beginning with the request for identification that the officer testified was based on "safety concerns." 584 F.3d at 25. We explained:

> [The officer's] initial few questions concerning Chaney's identification were allowable officer safety measures, not

---

[5] We noted that "[a]ny additional delay . . . was independently warranted by the officer's reasonable suspicion, based on Chaney's implausible answers and nervous demeanor, that Chaney was giving a false name and might be involved in other criminal activity." Id. at 26.

-13-

> themselves requiring any individualized
> suspicion of Chaney, but rather justified
> based on the inherent dangers of the motor
> vehicle stop and the officer's need to orient
> himself to who and what he may be dealing
> with. His actions thereafter were each
> justified by reasonable suspicion warranting
> further investigation and were related in
> nature and scope to dispelling the officer's
> legitimate concerns.

Id. at 27 (emphasis added).

This case differs from Chaney because Officer Pistolese did not invoke the "officer safety function," id., but instead testified that he requested Fernandez's identification so that he could issue a seat belt citation. That difference in the asserted justification for the inquiry is not, however, of consequence. So long as the request did not "measurably extend the duration of the stop," Johnson, 129 S. Ct. at 788, Pistolese did not need an independent justification to ask Fernandez for identification. Mena, 544 U.S. at 101. It makes no sense to say that his belief that he possessed such a justification, if incorrect, would make an otherwise permissible inquiry unlawful. Indeed, the Supreme Court has repeatedly held that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." See Whren v. United States, 517 U.S. 806, 813 (1996).[6]

---

[6] In Whren, the Court rejected the argument that an officer's motive could "invalidate[] objectively justifiable behavior under the Fourth Amendment," 517 U.S. at 812, citing prior cases that it described as "foreclos[ing] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved," id. at 813.

-14-

Other circuits had concluded before <u>Johnson</u> that officers could properly ask a passenger for identification in circumstances similar to those before us, and <u>Johnson</u>'s discussion of the permissible scope of a traffic stop has only strengthened such precedent. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Diaz-Castaneda</u>, 494 F.3d 1146, 1152 (9th Cir. 2007) (stating, in the context of a passenger inquiry, that "[t]he police may ask people who have legitimately been stopped for identification without conducting a [separate] Fourth Amendment search or seizure") (citing <u>Hiibel</u>, 542 U.S. at 185); <u>United States</u> v. <u>Soriano-Jarquin</u>, 492 F.3d 495, 500 (4th Cir. 2007) ("If an officer may 'as a matter of course' and in the interest of personal safety order a passenger physically to exit the vehicle, he may surely take the minimally intrusive step of requesting passenger identification.") (citing <u>Wilson</u>, 519 U.S. at 410); <u>United States</u> v. <u>Rice</u>, 483 F.3d 1079, 1084 (10th Cir. 2007) ("[B]ecause passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification from passengers and run background checks on them as well.") (citing <u>Wilson</u>, 519 U.S. at 413-414).

We therefore hold that, based on the record before us, no Fourth Amendment violation occurred. Accordingly, we affirm the judgment of conviction.

<u>So ordered.</u>