BRISCOE, Chief Judge,
dissenting.
I respectfully dissent for two reasons. First, Agent Stanko’s request for identification from De La Cruz was supported by reasonable, articulable suspicion based on the evolving events following the initial stop. But more importantly, Agent Stan-ko did not need independent justification under the Fourth Amendment to request identification. The request was not a “discrete Fourth Amendment event,” Muehler v. Mena, 544 U.S. 93, 101, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005), but a minimal additional intrusion within the course of a lawful stop that did not illegally extend the duration of the stop. Looking to the totality of the circumstances known to Agent Stanko when he asked De La Cruz for his identification, I would affirm the district court’s denial of De La Cruz’s motion to suppress.
I
The proper outcome of this case is dictated by the Supreme Court’s decisions in Muehler, 544 U.S. 93, 125 S.Ct. 1465, and Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County, 542 U.S. 177, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004), and our decision in United States v. Alcaraz-Arellano, 441 F.3d 1252 (10th Cir.2006). The rule from these cases is unmistakable: when an individual is already lawfully detained, an officer is permitted to question the individual — even on matters unrelated to the purpose of the detention — when such questioning does not measurably extend the duration of the detention. The “touchstone” of this analysis is reasonableness, “measured in objective terms by examining the totality of the circumstances.” Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (quotation omitted). And if off-topic questioning is permissible, it is axiomatic that an officer may request identification from an individual when confirming or dispelling suspicion as to the individual’s identity is the purpose of the stop.
Agent Stanko’s request for identification from De La Cruz was not unrelated to the stop, but rather was at the very heart of the reason for the stop: to determine whether the driver was Guel-Rivera. This brief interaction did not meaningfully prolong an ongoing, lawful seizure, so no independent reasonable suspicion was required.
*1202 A
Under Terry’s “dual inquiry,” we have long examined whether an investigative detention was: (1) “justified at its inception,” and (2) “reasonably related in scope to the circumstances which justified the interference in the first place.” Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under the second, or “scope,” prong, we have traditionally required that an officer’s investigation closely conform to the purpose of the initial stop unless the officer develops additional reasonable suspicion. See United States v. Jones, 44 F.3d 860, 872 (10th Cir.1995) (holding that officer must have reasonable suspicion to support questions about narcotics during routine traffic stop); see also Terry, 392 U.S. at 19-20, 88 S.Ct. 1868. But several years ago, the Supreme Court addressed the long-divisive question[1] of whether Terry’s “scope” prong restricts an officer’s questioning to matters that relate to the purpose of the initial stop.
In Muehler, a team of SWAT officers executed a search warrant at a residence to look for dangerous weapons and evidence of gang membership. 544 U.S. at 96, 125 S.Ct. 1465. The officers knew many of the gang’s members were illegal immigrants, so a federal immigration agent accompanied the team. Id. The officers found Iris Mena in a bedroom, placed her in handcuffs, and led her to a converted garage with other occupants. Id. “During their detention in the garage, an officer asked for each detainee’s name, date of birth, place of birth, and immigration status. The [immigration] officer later asked the detainees for their immigration documentation.” Id.
The Court rejected the Ninth Circuit’s conclusion that the officers “were required to have independent reasonable suspicion in order to question Mena concerning her immigration status because the questioning constituted a discrete Fourth Amendment event.” Id. at 100-01, 125 S.Ct. 1465. This premise was “faulty” because “mere police questioning does not constitute a seizure.” Id. at 101, 125 S.Ct. 1465 (quotation and citation omitted). “[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual’s identification; and request consent to search his or her luggage.” Id. (quotation and citation omitted). “Hence, the officers did not need reasonable suspicion to ask Mena for her name, date and place of birth, or immigration status.” Id.
This rule gave shape to the Court’s prior pronouncement that “[i]n the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment.” Hiibel, 542 U.S. at 186, 124 S.Ct. 2451; see also INS v. Delgado, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) (“[I]nterrogation relating to one’s identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.”). Other courts have applied these principles in upholding officer requests for identification from passengers in a vehicle stopped for a traffic violation, even when there is no particularized suspicion that *1203 the passengers are violating the law. See United States v. Fernandez, 600 F.3d 56, 60 (1st Cir.2010) (“The Court repeatedly has held that police requests for identifying information typically do not trigger Fourth Amendment concerns.”); Stuffle-beam v. Harris, 521 F.3d 884, 888 (8th Cir.2008) (“[A] police officer does not violate the Fourth Amendment by inquiring into the identity of a vehicle’s passenger during the course of a lawful traffic stop, even absent reasonable suspicion that the passenger has committed a crime.”); United States v. Diaz-Castaneda, 494 F.3d 1146, 1152 (9th Cir.2007) (“The police may ask people who have legitimately been stopped for identification without conducting a [separate] Fourth Amendment search or seizure.”); United States v. Soriano-Jarquin, 492 F.3d 495, 500 (4th Cir.2007) (“If an officer may ‘as a matter of course’ and in the interest of personal safety order a passenger physically to exit the vehicle, he may surely take the minimally intrusive step of requesting passenger identification.” (citation omitted)). After Muehler, “mere questioning — on any subject — cannot violate the scope prong of Terry.” United States v. Everett, 601 F.3d 484, 494 n. 10 (6th Cir.2010).
While a request for identification is minimally intrusive and well within the bounds of Terry, we still must look to the effect of the questioning on the duration of the detention. The Supreme Court has given wide berth to officers in questioning individuals who are lawfully detained, but it is less clear how long an officer can venture down a new path. In general terms, the Court has stated that questioning may not “measurably extend the duration of the stop.” See Arizona v. Johnson, 555 U.S. 323, 334, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009) (“An officer’s inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.”).
We confronted the “prolongation” issue in Alcaraz-Arellano. 441 F.3d 1252. There, an officer stopped the defendant for speeding but asked him questions that were unrelated to the purpose of the stop. Id. at 1258-59. Applying Muehler, we held that “the questioning, regardless of the topic, did not violate the Fourth Amendment” because it “did not prolong the detention.” Id. at 1259. In looking to the duration, we refused to adopt a bright-line rule; instead, we looked to the totality of the circumstances to determine whether the stop was “appreciably” prolonged. Id. at 1258-59. Rather than “make a time and motion study of traffic stops,” we “consider the detention as a whole and the touchstone of our inquiry is reasonableness.” United States v. Patterson, 472 F.3d 767, 776 (10th Cir.2006), vacated on other grounds, 555 U.S. 1131, 129 S.Ct. 989, 173 L.Ed.2d 283 (2009).
Similarly, other courts have held that an officer is entitled to ask questions unrelated to the initial purpose of the stop so long as those questions do not “unreasonably extend” the detention. United States v. Martin, 422 F.3d 597, 601-02 (7th Cir.2005) (“A traffic stop does not become unreasonable merely because the officer asks questions unrelated to the initial purpose for the stop, provided that those questions do not unreasonably extend the amount of time that the subject is delayed.”); see also United States v. Digiovanni, 650 F.3d 498, 507 (4th Cir.2011) (“[W]here a delay [attributed to off-topic questioning] can be characterized as de minimis under the totality of the circumstances, it will not be recognized as a Fourth Amendment violation.”); Everett, 601 F.3d at 494 (holding that “the proper inquiry is whether the ‘totality of the circumstances surrounding the stop’ indicates *1204 that the duration of the stop as a whole— including any prolongation due to suspi-cionless unrelated questioning — was reasonable”).
In light of these cases, it is clear that officers may engage in questioning on any subject that has a de minimis effect on the duration of the traffic stop. Alcaraz-Arellano, 441 F.3d at 1259. Of all possible topics, this rule manifestly permits questions related to an individual’s identity, which “are a routine and accepted part of many Terry stops.” Hiibel, 542 U.S. at 186, 124 S.Ct. 2451.
B
These principles lead me to conclude that Agent Stanko’s request for identification was not a “discrete Fourth Amendment event” requiring reasonable suspicion. Muehler, 544 U.S. at 101, 125 S.Ct. 1465. Rather, it was a minimal additional intrusion within the course of a lawful stop.
At the outset, it is necessary to determine whether the stop was ongoing when Agent Stanko questioned De La Cruz about his identity. If the stop had reached its logical conclusion when Agent Stanko questioned De La Cruz, he would have needed reasonable suspicion to justify any continued interaction. See United States v. McSwain, 29 F.3d 558, 561 (10th Cir.1994) (holding that once “the purpose of the stop was satisfied,” an officer’s continued detention of the driver “exceeded the scope of the stop’s underlying justification”). “Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave.” Johnson, 555 U.S. at 333, 129 S.Ct. 781.
By the time Agent Stanko returned to a handcuffed De La Cruz,[2] the nature and scope of the initial stop had changed considerably. He and another agent had just chased down a passenger who fled upon seeing them approach. The agents had determined that the passenger was an illegal alien, but they had no way of knowing why he ran away. Were there guns, drugs, or a dead body in the car? Stolen items from a recent robbery? Or was he simply trying to avoid deportation? We cannot expect the reasonable law enforcement officer in this situation to disengage completely from the events that he had just witnessed and permit the vehicle’s other occupants to go on their way, leaving these questions unanswered. In light of the developments, these agents had a continuing “need to control the scene” when they returned to the vehicle. See id. Thus, Agent Stanko questioned De La Cruz as part of an ongoing, lawful seizure.
In light of Muehler and Alcaraz-Arella-no, we must determine only whether the questions appreciably lengthened the duration of the stop; the content of the questions is irrelevant.[3] Viewed in the light *1205 most favorable to the government, the record indicates Agent Stanko questioned De La Cruz “almost immediately after returning to the scene” for “a minute or two.” ROA, Vol. II at 15. This questioning did not subject De La Cruz to a significant additional intrusion. Given the totality of the circumstances, the identification check did not “measurably extend the duration of the stop.” Johnson, 555 U.S. at 334, 129 S.Ct. 781.
II
In the alternative, even assuming Agent Stanko needed reasonable, articulable suspicion that De La Cruz was engaged in criminal activity to question him about his identity, that requirement is satisfied.
Again, we must consider the totality of the circumstances confronting the officer, and we must do so in the light most favorable to the government. First, Agent Stanko’s quick glimpse of De La Cruz as he drove into the parking lot led him to believe that he had found Guel-Rivera, the targeted alien. But when he returned from the foot chase, he had “a pretty good idea” he had been mistaken. ROA, Vol. II at 18. His testimony reveals lingering concern about these perceptions. He testified:
I can say without a doubt upon returning to the scene, at this point, upon seeing Rivera stand up, I noticed the tattoo on his neck, I noticed his person, the hairline. All of the factors, all the above, whenever I returned to the scene and was able to get an entire visual of the defendant I had a pretty good idea that he wasn’t Guel-Rivera, but just to be safe I went ahead and ran his information anyway because I still wasn’t a hundred percent sure.
Id. (emphasis added). On cross-examination, Agent Stanko reiterated: “As I’m standing there beside him shortly after I approached the vehicle ... I have yet to conclusively dispose of my suspicions, my observations that I had observed as he entered the lot.” Id. at 39. This testimony suggests he was still unsure about the driver’s identity after he returned from chasing the fleeing passenger. De La Cruz’s resemblance of Guel-Rivera was the predicate for the initial stop, and it had not dissipated by the time Agent Stanko requested identification.
Second, while not dispositive, the passenger’s flight was a further fact that only strengthened the agent’s belief that De La Cruz was, in fact, the targeted alien. Agent Stanko’s first close look at De La Cruz came just after he returned from a hot pursuit of the passenger, who turned out to be an illegal alien. Of course, as the majority points out, it would be unreasonable to conclude that De La Cruz is present in the United States illegally simply by virtue of his “mere propinquity” to an illegal alien. See Ybarra v. Illinois, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). But this development does not stand alone, and it must carry some force in the reasonable suspicion analysis. Given the circumstances, we cannot expect a trained immigration agent to completely dismiss the fact of a passenger’s flight when considering the possibility that other occupants of the vehicle may be engaged in criminal activity.[4]
Third, the agents knew Gill’s Truck Wash employed illegal, aliens, including *1206 Guel-Rivera. As the stop occurred before the business was open, a reasonable agent could have concluded that one or more of the occupants in the car were truck wash employees or were engaged in harboring aliens.
Taken together, these facts support a request for identification to “verify or dispel the officer’s suspicion in a short period of time.” Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion). Further, when Agent Stanko’s testimony is viewed in the proper light, he had yet to dispel his suspicions when he questioned De La Cruz about his identity. His request for De La Cruz’s identification was supported by reasonable suspicion.
Ill
I would affirm the order of the district court denying De La Cruz’s motion to suppress.

. Compare United States v. Holt, 264 F.3d 1215, 1228 (10th Cir.2001) (en banc) (per curiam) C'[A]n officer conducting a traffic stop may ask the driver about the presence of loaded weapons in the absence of particularized suspicion of the existence of such firearms.”), abrogated as recognized in United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir.2007); with United States v. Chavez-Valenzuela, 268 F.3d 719, 724 (9th Cir.2001) ("An officer must ... restrict the questions he asks during a stop to those that are reasonably related to the justification for the stop.”), as amended by 279 F.3d 1062 (9th Cir.2002), abrogated by Muehler, 544 U.S. 93, 125 S.Ct. 1465.

. There is disagreement as to whether De La Cruz was still handcuffed when Agent Stanko asked him for identification. Agent Stanko testified that he did not handcuff De La Cruz before pursuing the passenger. ROA, Vol. II at 17. Agent Newman testified that he handcuffed De La Cruz as soon as the passenger ran away. Id. at 58-59. He did not remember whether De La Cruz was still in handcuffs when Stanko returned and asked him for identification. Id. at 59. De La Cruz argues that the resolution of this dispute is not pertinent to his case because he was detained either way. Id. at 66. Indeed, Newman instructed him not to move and the ICE vehicle’s emergency lights were activated.

. That said, Agent Stanko’s questioning was eminently reasonable “based on the inherent dangers of the motor vehicle stop and [his] need to orient himself to who and what he may be dealing with.” United States v. Chaney, 584 F.3d 20, 27 (1st Cir.2009). And again, ascertaining the identity of a lawfully detained individual is a “routine and accepted part of many Terry stops.” Hiibel, 542 U.S. at 186, 124 S.Ct. 2451.

. At the suppression hearing, the government suggested that continued detention was proper because De La Cruz presumably knew that his passenger was in the country illegally. ROA, Vol. II at 68-69. But the government struggled to identify a relevant federal offense; it grappled with the idea that harboring an illegal alien could be a crime before ultimately dropping the argument. See id.